PRESENT:  All the Justices

JOANNA PALMER

OPINION BY
v.  Record No. 160664                           JUSTICE ELIZABETH A. McCLANAHAN
                                                      September 14, 2017
R. A. YANCEY LUMBER CORPORATION


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

Joanna Palmer challenges the circuit court's order approving modifications to an

easement by necessity crossing her property.  The court did so after finding that the

modifications are reasonably necessary for the beneficial use of property owned by R. A. Yancey

Lumber Corporation ("Yancey").  We affirm the judgment of the circuit court.

I.  BACKGROUND

The parties stipulated to the following facts.  Palmer owns approximately 44 acres

located in Albemarle County adjoining State Route 736 (the "Palmer Property").  Yancey owns

317 contiguous acres located in Albemarle County and Nelson County (the "Yancey Property").

The Palmer Property and the Yancey Property derived from the common ownership of Richard

Richardson, dating back to the time of his death in 1828.[1]  Richardson's property was subdivided

at that time with the probate of his will and the Yancey Property was left landlocked.  That is to

say, there was no access from the Yancey Property to a public road by an express easement or

any other means.

Consequently, when Richardson's property was subdivided, "an implied easement by

necessity for access and reasonable use and enjoyment of the Yancey Property was created by

_____

[1] Yancey's founder began acquiring the tracts of land comprising the Yancey Property in
1958.  Palmer acquired the Palmer Property in 1998.

the law burdening the Palmer Property and for the benefit of the Yancey Property." A private road (the "Access Road") has long been and continues to be "the sole means of ingress and egress from the Yancey Property to a public road," which "comprises some or all of Yancey's easement by necessity." The Access Road runs from the corner of the Yancey Property through two intervening tracts of land (the "Kiser Property" and the "Campbell Property"[2] owned by third parties), and then through the Palmer Property to State Route 736. Yancey and its predecessors have used the Access Road "for ingress and egress purposes, including but not limited to access for timbering and timber related activity," and "[t]he ability to timber the property is reasonably necessary for the enjoyment of the Yancey Property." In their final stipulation, however, Yancey and Palmer state that they disagree over "the size and scope of the easement by necessity."

The disagreement arose when Yancey prepared to presently harvest timber from the Yancey Property. It last timbered the property in the late 1980's. Its plans are to cut approximately 83 acres of pines and then cut some of the mixed hardwood in the near future. Yancey also wants to haul the logs using tractor-trailers instead of ten-wheel logging trucks— which are the kind of trucks that Yancey's neighbor had recently used for four to five weeks to haul timber from the Campbell Property. This would necessitate improving and widening the Access Road in certain locations. Yancey was given an express nonexclusive easement to use the Access Road for ingress and egress of vehicles, "including without limitation customarily used tree harvesting equipment and transports," by the owners of the Kiser Property and the

---

[2] The Access Road was specifically referenced in a deed in the chain of title for the Campbell Property that was recorded in the Albemarle County land records in 1903.

Campbell Property. Palmer rejected Yancey's request for such an express easement over the Palmer Property.

Yancey thereafter filed the instant declaratory judgment action against Palmer alleging, among other things, the facts set forth in the above-stated stipulations, along with the allegation that "[t]imbering is the best and highest use of the Yancey Property." Yancey further alleged that it is thus "entitled to use the Access Road for ingress and egress for all purposes, including timbering . . . as an easement by necessity."[3] Yancey asked the circuit court to (i) declare that it possesses such an easement as a "permanent easement, wide enough for ingress and egress of all vehicles [used for, among other purposes,] timbering," and (ii) enjoin Palmer from interfering with its right to so use the easement.

Prior to trial, the parties agreed to the above-stated stipulations and then a two-day bench trial was conducted. In its case in chief, Yancey presented the testimony of its president, Emmett Yancey ("Emmett"), who explained Yancey's plans for timbering both the pines and mixed hardwoods on the Yancey property. This includes Yancey's desire to modify the Access Road in order to enable the company to utilize tractor-trailers for transporting the logs from the Yancey Property to State Route 736, and from there to its sawmill at another location. Using tractor-trailers, according to Emmett, is the most efficient and cost-effective way to haul the logs—as opposed to using the shorter ten-wheel logging trucks. Moreover, it is the only way to haul the pine logs at full-length, which is the size best suited for Yancey's sawmill equipment and most demanded in the lumber market.

---

[3] Yancey proceeded only on the claim of easement by necessity under Count I of its Amended Complaint after the parties agreed to the dismissal of Counts II and III on claims of easement implied by prior use and prescriptive easement, respectively, without prejudice.

Yancey presented the testimony of William Foster, a land surveyor, who provided measurements of the Access Road on the Palmer Property to assist in specifically identifying the location and width of the modifications that Yancey was seeking to make to the Access Road. Foster testified that the Access Road is 30 feet wide at the entrance of the Palmer Property where it adjoins State Route 736. The roadbed, according to Foster, then varied in width from as wide as 15 feet to as narrow as 8 feet at the rock outcroppings along the edge of the roadbed near the Campbell Property.

Larry Endsley, a procurement manager for a lumber manufacturer, American Hardwood Industries, with nearly 40 years of experience in the timber industry, testified for Yancey as an expert witness regarding this industry, and specifically the economics and logistics of timber removal. This included expertise in road construction and modification for transporting timber over private properties. According to Endsley, timber industry standards dictate the use of tractor-trailers for timbering the Yancey Property based on both the volume and type of timber that Yancey plans to harvest. He testified that, under these standards, ten-wheel logging trucks would only be appropriate for smaller timbering operations, like the recent one on the Campbell Property, for economic reasons.[4] These standards, he further explained, also call for tractor-trailers to haul pine logs because the shorter ten wheel-trucks lack the capacity to haul pine logs at full-length. This part of his testimony essentially reiterated Emmett's earlier testimony. Endsley also provided extensive testimony regarding his recommendations for modifying the Access Road over the Palmer Property for purposes of accommodating tractor-trailers. This

---

[4] Compared to that timbering operation on the Campbell Property, which took four to five weeks, Endsley estimated that harvesting the hard wood alone from the Yancey Property would involve 15 times as much volume and would take from 6 to 12 months to complete.

would involve making various improvements, including widening that portion of the Access Road in three limited locations. As such, two-thirds of the Access Road over the Palmer Property would not be widened at all. Furthermore, according to Endsley, the Access Road needs to be widened at those locations, whether Yancey were to haul the timber by tractor-trailers or ten-wheel trucks, as the widths of the roadway at those locations are currently not suitable for even ten-wheel trucks.[5]

Finally, Yancey presented excerpts from Palmer's deposition. In those excerpts, Palmer indicated that she "absolutely" preferred that the Yancey Property be used for timbering as opposed to anything else. She further acknowledged that "you have to have access for large vehicles," and that it was "not possible to bring a tractor-trailer in without widening the [Access Road]." However, she testified that tractor-trailers, as opposed to ten-wheel logging trucks, "take it a step beyond" what she prefers to have "driving in front of [her] house," which is located approximately 40 to 50 feet from the Access Road (with a stream running between them) and approximately 300 feet from where the Access Road intersects with Route 736.

In defending against Yancey's action, Palmer did not offer any expert testimony to rebut Endsley's testimony. She offered only (i) her own lay testimony, consisting mainly of her objections to the proposed modifications to the Access Road for esthetic reasons; (ii) the lay testimony of a long-time friend, who was familiar with the Access Road because he had been Palmer's "house sitter" many times over the course of several years; and (iii) the lay testimony of a nearby neighbor, who in previous years had frequently walked to a spring near Palmer's house using the Access Road. Each of these witnesses described the condition of the Access Road as it appeared over several years and compared that to how it currently appears. They also described

---

[5] *See* Part II(B)(2), *infra* (addressing this portion of Endsley's testimony in detail).

the logging truck traffic on the Access Road that they had observed on various occasions over the years. Palmer testified in particular about her recent observations of ten-wheel trucks hauling timber from the Campbell Property for a period of four to five weeks. Her neighbor added that this amounted to "heavy traffic."

Palmer's overall objection to Yancey's action was that its proposed modifications to the Access Road would result in negatively impacting the character of her property. More specifically, Palmer stated that she objected to, among other things, the entrance to her property being widened because she did not want it to look like a commercial entrance; to any trees being trimmed or removed; and to the removal of any rock outcroppings.

The circuit court took the matter under advisement and thereafter held a hearing to issue an oral ruling. The court rejected Palmer's argument that as a matter of law the easement by necessity could not be widened by order of the court without her consent. The court concluded that it did have such authority. The court then determined that, based upon the parties' stipulations of fact that Yancey possesses what has long been an easement by necessity along the Access Road over the Palmer Property, "the sole dispute before the [c]ourt is the scope of the easement by necessity." Quoting from *Keen v. Paragon Jewel Coal Co.*, 203 Va. 175, 179, 122 S.E.2d 543, 546 (1961), the court stated that the type of traffic permitted for a dominant landowner utilizing an easement by necessity is "determined by the reasonable necessities for the enjoyment" of the dominant property. The court reasoned that the factual dispute in the present case thus centers on what is reasonably necessary for Yancey to transport and market its timber from the Yancey Property.

Applying this common law standard and relying heavily on Endsley's expert testimony, the circuit court made factual findings that it is reasonably necessary for Yancey to use tractor-

6

trailers to transport the timber, and to, in turn, widen its easement to accommodate such use by making certain modifications to the Access Road on the Palmer Property. In reaching this decision, the court indicated that it was relying, at least in part, upon the timber industry standard calling for the use of tractor trailers for timbering large properties like the Yancey Property. The court also indicated its reliance upon the standard in the industry of using tractor-trailers for harvesting pines in particular because, as the court found, "they are so long and ten-wheelers simply cannot accommodate the length of the logs."

The circuit court then explained generally the modifications to the Access Road on the Palmer Property that it would approve, which included several but not all of the modifications recommended by Endsley. The primary modifications announced by the court at that time, as relevant to this appeal, were as follows: an increase in the width of the Access Road's entrance from State Route 736 by a few feet on each side to establish a 40-foot entrance; placement of rock in the bottom of a ford where a stream crosses the Access Road; elimination of a rock outcropping located along the edge of the Access Road near the Campbell Property in order to widen it at that location; and trimming limbs from a grove of pines that extend into the Access Road.

Afterwards, Palmer and Yancey could not agree on the language contained in the proposed final order drafted by Yancey's counsel at the circuit court's direction. As a result of the disagreement, the court held another evidentiary hearing to further address the precise details of the modifications to be made to the Access Road on the Palmer Property as determined by the court to be reasonably necessary. At this hearing, the court again heard the testimony of Endsley, Yancey's expert witness, who provided additional specific information regarding his proposals for modifying the Access Road. The only other witness was Palmer, who again

offered her lay opinion in support of her opposition to those proposals for esthetic reasons. The court then engaged in a lengthy colloquy with counsel for both sides addressing in detail each of the proposed modifications and the corresponding language for their inclusion in the final order.

The circuit court thereafter entered a final order in favor of Yancey. The order establishes Yancey's right to the easement by necessity located across the Access Road on the Palmer Property for the benefit of the Yancey Property, as the parties had stipulated. It then specifies that Yancey is entitled to use the easement for ingress and egress for all lawful purposes, including but not limited to timbering. As to the type of travel, the order states: "That right is not restricted to the type of vehicles or mode of travel existing at the time the easement was created, but for any vehicle which reasonable needs may require in the development of the Yancey Property. Based on the evidence at trial, the [c]ourt specifically finds that tractor trailers are reasonably necessary and may be driven across the Easement." The order then sets forth in detail the specific modifications to the Access Road that the court found to be reasonably necessary to accommodate such travel.[6]

---

[6] The modifications are set forth in paragraph 19 of the final order as follows:

i. The entrance to the Access Road from State Route 736 (the "Entrance") may be widened to a width of forty (40) feet and will taper back to a width of twenty (20) feet by the first nail (a "station marker") located approximately 37.10 feet from the entrance.

ii. A pipe may be installed approximately 5 to 15 feet from the Entrance, running parallel along the width of the Entrance to help direct the stream crossing located near the Entrance. So long as it is installed, this pipe shall be maintained by Yancey.

iii. Yancey may add gravel to the Easement as necessary.

iv. Yancey may add stone and/or fill and may grade as necessary to fill in ruts in the Easement.

v. Yancey may fill in the large hole and otherwise repair the Easement located approximately 97 feet from the Entrance.

vi.   Trees, branches, foliage and overgrowth may be trimmed or cut if they are rubbing, interfering with or obstructing the path of vehicles traveling over the Easement.

vii.   From approximately the second station marker located approximately 117.10 feet from the Entrance to the third station marker located approximately 209.30 feet from the Entrance, Yancey may grade, shape and drain the Easement. If grading doesn't eliminate the berm, Yancey may install outlets by cutting or digging gaps in the berm as needed to allow for drainage.

viii.   Yancey may remove the oak tree on the south side of the Easement obstructing the path of truck traffic approximately located from the sixth station marker (approximately 382.07 feet from the Entrance) to the seventh station marker (approximately 450.82 feet from the Entrance).

ix.   The stream crossing approximately located between the seventh station marker (approximately 450.82 feet from the Entrance) to the eighth station marker (approximately 488.28 feet from the Entrance) may be armored and reinforced using stone, large rocks or other material as necessary and required by state regulations.  This area is to remain passable by personal passenger vehicles. The Court orders that the Access Road may be shifted three feet into the berm.  It is permitted to be stoned and the trees may be trimmed but not removed.

x.   Between station marker eight to eleven, the curve may be widened to no more than eighteen feet, including the original roadbed.

xi.   Rocky outcroppings approximately located between tenth station marker (approximately 593.84 feet from the Entrance) to the twelfth station marker (approximately 693.84 feet from the Entrance) may be graded to the level of the road providing a maximum road width of eighteen (18) feet.  The large rock may not be disturbed.  The Easement also needs to be straightened and shifted north approximately ten (10) feet at approximately the eleventh station marker (approximately 643.84 feet from the Entrance).

xii.   From approximately the eleventh station marker (approximately 643.84 feet from the Entrance) to the thirteenth station marker (the western boundary of the Palmer Property located at approximately 838.48 feet from the Entrance), Yancey may grade, shape and drain the Easement.

xiii.   After the repairs, modifications and/or improvements described in this Order have been completed, the resulting Easement will be a width of 20 feet (except for the width of the Entrance as described in (i) above) including the roadbed measured 10 feet on either side of the centerline as shown on the Survey [attached to the Order as Exhibit A] and includes necessary maintenance and repairs, which the Court finds is reasonably necessary for the purpose of timbering the Yancey Property.  The roadbed itself cannot be altered or modified except as set forth in this Order.

9

## II.  ANALYSIS

On appeal, Palmer argues the circuit court erred by granting Yancey the right to modify its easement by necessity extending over the Access Road on the Palmer Property because the modifications will unlawfully increase the width of an established easement by necessity. Alternatively, she argues the court erred by granting Yancey the right to modify the easement in order to use tractor-trailers over the Access Road because this will unreasonably increase the burden on the Palmer Property.

### A.  PERMISSIBILITY OF WIDENING THE EASEMENT

Palmer asserts on brief that Virginia law is unclear as to the permissibility of widening an easement by necessity and argues in favor of a "bright-line rule" that such an easement, "once located, cannot be widened" without the consent of the servient landowner.  Appellant's Br. at 9. She thus frames this argument as an issue of law in challenging the circuit court's ruling to the contrary, which we review de novo.  *Clifton v. Wilkinson*, 286 Va. 205, 208, 748 S.E.2d 372, 373 (2013).

We hold that the circuit court correctly decided that it had the authority, as a matter of law, to grant a dominant landowner the right to widen an established easement by necessity without the servient landowner's consent.[7]  While this Court has not previously addressed this precise issue, our holding is consistent with both the Court's application of well-settled common law principles governing easements by necessity in numerous cases, and the holdings of courts in

---

[7] Whether the circuit court erred in exercising that authority when deciding upon the reasonability of Yancey's proposed easement modifications, which presents an issue of fact, is the subject of our analysis in Part II.B., *infra*.

10

other jurisdictions that have similarly determined that such easements may be so expanded.[8]

*See, e.g., Traders, Inc. v. Bartholomew*, 459 A.2d 974, 978-80 (Vt. 1983) (remanding case to

trial court to determine increase in width of existing easement by necessity); *Beck v. Mangels*,

640 A.2d 236, 249-50 (Md. Ct. Spec. App. 1994) (upholding trial court's ruling which increased

width of existing easement by necessity).

Palmer cites no authority on point from any jurisdiction in support of the rule that she

advocates on brief for application to easements by necessity, referring to it as "Palmer's rule."

Appellant's Br. at 9 & 20-22.  She instead relies principally on cases addressing express

easements and easements by prescription, which have their own set of rules separate and apart

from the rules governing easements by necessity, as fashioned in the course of their own unique

historical development.[9]  The easement by necessity rules, discussed *infra*, are the antithesis of

---

[8] We note that just as the terms "easement" and "right of way" are used in case law and legal treatises interchangeably in the context of roads, so too are the terms "easement by necessity" or "easement of necessity" and "way of necessity," as will be seen in the following discussion.  *See, e.g., Clifton*, 286 Va. at 210-11, 748 S.E.2d at 374-35; *Middleton v. Johnston*, 221 Va. 797, 803, 273 S.E.2d 800, 803 (1981); *Keen*, 203 Va. at 178-81, 122 S.E.2d at 546-48.

[9] In addition to her reliance upon inapposite Virginia cases addressing express easements and easements by prescription, Palmer, on brief, relies heavily on three out-of-state cases as authority for her position: *Dudgeon v. Bronson*, 64 N.E. 910 (Ind. 1902); *Johnson v. Lunsford*, 168 S.E. 382 (W. Va. 1933); and *Gacki v. Bartels*, 859 N.E.2d 1178 (Ill. App. Ct. 2006).  She there asserts that the courts in those cases held that "width expansion" of easements by necessity is "not allowed" without the express or implied consent from the servient landowner. Appellant's Br. 10.  She is mistaken in that assertion as there is no such holding in any of those cases.  In *Dudgeon*, the court addressed the unavailability of an easement by necessity where the dominant landowner possessed an express easement.  *Dudgeon*, 859 N.E. at 910-11.  The court held that the allegations that the express easement had become "inconvenient" was an insufficient basis for claiming "an additional strip [over the servient estate] as a way of necessity."  *Id.*  In *Johnson*, the court held that the dominant landowner had no right to surrender and abandon the route of his easement by necessity in favor of an entirely different route over the servient estate.  The court reached that decision because the record showed that the dominant landowner's use of the latter route was not undertaken adversely but instead by permission from the servient landowner, "and no reason appear[ed] why [the permission] could not be voluntarily withdrawn."  *Johnson*, 168 S.E. at 382.  Finally, in *Gacki*, the court merely held that when an

11

the static rule that Palmer has advocated to the circuit court and to this Court on brief—to freeze the parameters of an easement by necessity to those that existed at the time of its inception. Under this view, an easement by necessity that began as a footpath, a horse trail, or a wagon road would be forever fixed by those physical limitations if the servient landowner so desired, without regard to the resulting limits on the useful development of the dominant estate compared to the incremental burden, if any, on the servient estate that would result from an expansion of the easement. Accordingly, if the easement by necessity was, for example, three feet wide at the time of its inception in the 1800's and conducive to transporting only one log at a time by horse, such limited use of the easement in relation to timbering would necessarily be enforceable today, under Palmer's untenable rule.[10]

Palmer challenges the circuit court's decision with assertions based on an erroneous premise. She asserts that "[t]he physical dimensions of the easement [at issue here] were agreed to when the location was set many years ago." Appellant's Br. at 9. "Changing [its] width, many years later," she concludes, "would thwart the implied understanding between the original dominant and servient owners." *Id.* But there is absolutely no evidence of any agreement or understanding, express or implied, between the original landowners regarding any aspect of an

---

easement by necessity is judicially established, a court must determine as part of its "actual creation," among other things, the width of the easement. *Gacki*, 859 N.E.2d at 1187. In sum, none of these cases held that the width of an established easement by necessity can never be expanded in the future based on a change in circumstances regarding the use of the dominant estate.

[10] At oral argument before this Court, Palmer's counsel backtracked on her proposed bright-line rule when questioned from the bench about the above-stated example. However, her counsel still argued for some kind of fixed rule that would limit an easement by necessity's expansion to what he described as "small modifications" to accommodate "automobiles," which would arbitrarily exclude tractor-trailers regardless of the specific facts of the case. Oral Argument Audio at 8:20 to 9:11.

12

easement. Indeed, it was for that reason that the easement by necessity along the Access Road arose when Richardson's property was subdivided in 1828 and the Yancey Property became landlocked, as the parties stipulated.[11]

To be sure, Yancey's easement, like all easements by necessity, is characterized in the law as an "implied easement." *Carter v. County of Hanover*, 255 Va. 160, 168-70, 496 S.E.2d 42, 46-47 (1998) (comparing implied easements from prior use to easements by necessity, both of which "arise by implication"); *see also Davis v. Henning*, 250 Va. 271, 276, 462 S.E.2d 106, 108 (1995) (holding that "the required elements of an implied easement by necessity" were met); *American Small Business Inv. Co. v. Frenzel*, 238 Va. 453, 457, 383 S.E.2d 731, 734 (1989) ("[T]he implied easement of necessity must arise contemporaneously with the severance of the unity of title."). Such easements are implied, however, by operation of law based on long-standing policy considerations under the common law. In *Keen*, we explained:

> "A way of necessity is an easement arising from an implied grant or implied reservation; it is of common-law origin and is supported by the rule of sound public policy that lands should not be rendered unfit for occupancy or successful cultivation. Such a way is the result of the application of the presumption that whenever a party conveys property, he conveys whatever is necessary for the beneficial use of that property and retains whatever is necessary for the beneficial use of land he still possesses."

---

[11] The elements of easement by necessity are as follows: (1) the dominant and servient estates were derived from a common title, i.e., "at some time in the past, [they] belonged to the same person," (2) the easement is "reasonably necessary to the enjoyment of the dominant estate," and (3), the dominant estate became landlocked at the time of the severance of the two estates and there is no "means of ingress and egress" other than over the servient estate. *Hurd v. Watkins*, 238 Va. 643, 653-54, 385 S.E.2d 878, 884 (1989) (citing *Middleton v. Johnston*, 221 Va. 797, 802-04, 273 S.E.2d 800, 803 (1981)). The easement thus arises at the time the dominant and servient estates are severed, even if it is not "judicially established" for many years after the severance. *Carstensen v. Chrisland Corp.*, 247 Va. 433, 442, 442 S.E.2d 660, 665 (1994).

13

203 Va. at 178-79, 122 S.E.2d at 546 (quoting 17A Am. Jur. *Easements* § 58 (1957)); *see Parker v. Putney*, 254 Va. 192, 195, 492 S.E.2d 159, 161 (1997) (implied easements by necessity are "based on [this] common law presumption" (quoting *Davis*, 250 Va. at 276, 462 S.E.2d at 108)); *see generally*, 4 Powell on Real Property § 34.07(1) (Michael Wolf ed., 2017) ("These fictional implications of 'intent' are actually rooted in considerations of public policy."); James W. Simonton, *Ways by Necessity*, 25 Col. L. Rev. 571, 601 (1925) ("The so-called presumed intent is pure fiction; the easement [by necessity] arises by operation of law, and it arises because the courts are influenced by the social interests involved.").

In establishing an easement by necessity, "[t]he fact of the necessity" thus becomes an issue of "great importance in determining whether an easement should be implied." *Jennings v. Lineberry*, 180 Va. 44, 48, 21 S.E.2d 769, 771 (1942) (quoting 17 Am. Jur. *Easements* § 48 (1938)). Under Virginia law, it has long been the rule that the "necessity" is "not a physical or absolute necessity but a reasonable and practicable necessity." *Smith v. Virginia Iron, Coal & Coke Co.*, 143 Va. 159, 164, 129 S.E. 274, 276 (1925); *see Parker*, 254 Va. at 196, 493 S.E.2d at 161; *Davis*, 250 Va. at 276, 462 S.E.2d at 109; *Frenzel*, 238 Va. at 456, 383 S.E.2d at 734; *Hurd v. Watkins*, 238 Va. 643, 653-54, 385 S.E.2d 878, 884 (1989); *Middleton v. Johnston*, 221 Va. 797, 803, 273 S.E.2d 800, 803 (1981); *Fones v. Fagan*, 214 Va. 87, 90, 196 S.E.2d 916, 918 (1973); *Keen*, 203 Va. at 179-81, 122 S.E. at 546-48; *Jennings*, 180 Va. at 48-49, 21 S.E.2d at 771. By adopting this rule, this Court aligned Virginia with the majority rule. *Middleton*, 221 Va. at 803, 273 S.E.2d at 803; *Jennings*, 180 Va. at 48-49, 21 S.E.2d at 771.

Under this majority rule, moreover, use of an easement by necessity is not limited to what was associated with the purposes for which the dominant estate was adapted at the time of the easement's creation—i.e., the time of severance from the servient estate. *Keen*, 203 Va. at 179-

14

81, 122 S.E. at 546-48. As we explained in *Keen*, "[t]he prevailing view in this country is that a way of necessity is not limited to such use of the land as was actually made and contemplated at the time of the conveyance, but is a way for any use to which the owner may lawfully put the granted land at any time." *Id*. at 180, 122 S.E. at 547 (quoting *Crotty v. New River & Pocahontas Consol. Coal Co*., 78 S.E. 233, 234 (W. Va. 1913)); *see Fones,* 214 Va. at 90, 196 S.E.2d at 918 ("The particular use requiring a way of necessity need not have existed at the time of the conveyance." (citing *Keen*, 203 Va. at 179, 122 S.E.2d at 547)). In short, the "scope" of the easement by necessity "may increase to meet the increased necessities of the property." *Keen*, 203 Va. at 179, 122 S.E. at 546.[12]

Such an increased necessity may require increasing the "sort of and quantity of traffic over" the easement, as occurred in *Keen* (discussed *infra*). *Id*.; *see Ashby v. Maechling*, 229 P.3d 1210, 1218 (Mont. 2010) ("[M]odern vehicle access . . . may be allowed as part of an easement by necessity even though the easement arose as a legal matter before the general use of such

---

[12] *See also Francini v. Goodspeed Airport, LLC*, 134 A.3d 1278, 1284 (Conn. App. Ct. 2016) ("Easements by necessity are not artifacts of a more ancient era and must serve their intended purpose, to render land useful, in the present day as the beneficial use of land conforms to modern innovations and needs. This follows from the general rule that the need constituting the necessity that implies an easement by necessity may change over time."); *see generally*, 7 Thompson on Real Property § 60.04(a)(1)(iii) (David Thomas ed., 3d ed. 2016) ("One determines whether an easement by necessity exists from the circumstances when the landlocked parcel was severed; one should define the scope, however, with reference to the reasonable enjoyment of the land and all lawful uses to which it may be put." (citation and internal quotation marks omitted)); 4 Powell on Real Property, *supra*, § 34.07(3) ("To the extent that easements by necessity rest on the 'operation of law' for the realization of the social objective of full land utilization, the easement by necessity must be flexibly adaptable to the well-known likelihood of changing property uses."); Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land § 8:7 (2012) ("[A]n easement [by necessity] is not limited to the extent of usage at the time that it was created. Most courts take the position . . . that since the easement is based on social considerations encouraging land use, its scope ought to be sufficient for the dominant owner to have the reasonable enjoyment of his land for all lawful purposes." (citations and internal quotation marks omitted)).

15

improvements."); *Schumacher v. Department of Natural Resources*, 663 N.W.2d 921, 923-24 (Mich. Ct. App. 2003) (rejecting contention that subject easement by necessity was limited to modes of transportation used when easement was created in early 1900's).

The increased necessity may also require widening the easement, as addressed by the Court of Special Appeals of Maryland in *Beck*. In most jurisdictions, the court explained, "a right-of-way of a specified width generally does not grow as the size of vehicles, etc., increases. The same is not true for implied ways of necessity." *Beck*, 640 A.2d at 249 (internal citation omitted). The court in *Beck* noted with approval that "[f]oreign jurisdictions generally agree that the scope of ways of necessity may be increased." *Id*. Accordingly, the court there held that the scope of an easement by necessity, including its width, "may reasonably increase with the dominant estate's necessary and reasonable needs as those needs exist, present and future." *Id*. at 250. Based on that holding, the court further held that the trial court's ruling approving an increase in the width of an existing easement by necessity was not error. *Id*. *See Adams v. United States*, 3 F.3d 1254, 1259 (9th Cir. 1993) ("Under the common law, a party having an easement by necessity is entitled to only one route, is entitled to reasonable use, and is entitled to an easement width that allows such reasonable use."); *Prince v. Edington*, 1983 Ohio App. LEXIS 14549, at *8 (Ohio Ct. App. Aug. 10, 1983) (observing that "[a]n easement by way of necessity . . . is not limited in its use to the original use of the lands, but expands and fluctuates to meet the growth, development and changed condition of such lands." (citing *Erie Railroad Co. v. S. H. Kleinman Realty Co.*, 110 N.E. 527 (Ohio 1915)); *Bartholomew*, 459 A.2d at 980 (holding that the "scope of an existing way of necessity" may be "enlarged," including the easement's width).

Applying the "reasonable necessity" rule in *Keen*, we affirmed the trial court's judgment in favor of the defendant/lessee coal mining company, holding that it had the right to haul coal over the road crossing plaintiff's property, the servient estate, under an easement by necessity. *Keen*, 203 Va. at 180-81, 122 S.E. at 547-48. We determined that the record supported the trial court's finding that the removal and transportation of the coal was reasonably necessary for the beneficial use of the dominant estate on which the company was mining the coal. *Id*. at 176-81, 122 S.E. at 544-48. Significantly, this determination was not altered by the fact that at the time of severance the properties comprising the dominant and servient estates were "in a state of nature, and there was no roadway in actual use" over the plaintiff/servient landowner's property. *Id*. at 180, 122 S.E.2d at 547. We ultimately concluded that the trial court, in balancing the interests of the separate estates, correctly found that the company's use of the easement over plaintiff's property "did not go beyond what was reasonably necessary" for transporting the coal. *Id*. at 181, 122 S.E.2d at 548.

The balancing of the interests of the dominant and servient estates provides the limiting principle for making the reasonable necessity determination. This limiting principle, which was implicit in *Keen* but not expressly stated, has been articulated in its application in numerous jurisdictions as follows: an easement by necessity is "coextensive with the reasonable needs, present and future, of the dominant estate," and "varies with the necessity, *insofar as may be consistent with the full reasonable enjoyment of the servient estate*." *Morrell v. Rice*, 622 A.2d 1156, 1160 (Me. 1993) (quoting 25 Am. Jur. 2d *Easements & Licenses* § 83 at 489 (1966)) (emphasis added); *see Keene v. Jackson*, 732 So. 2d 1138, 1140 (Fla. Dist. Ct. App. 1999); *Beck*, 640 A.2d at 249; *William C. Haak Trust v. Wilusz*, 949 N.E.2d 833, 838 (Ind. Ct. App. 2011); *Stroda v. Joice Holdings*, 207 P.3d 223, 230 (Kan. 2009); *Griffeth v. Eid*, 573 N.W.2d 829, 834

(N.D. 1998); *Soltis v. Miller*, 282 A.2d 369, 371 (Pa. 1971); *Bartholomew*, 459 A.2d at 980; *Richards v. Land Star Group, Inc.*, 593 N.W.2d 103, 108 (Wis. Ct. App. 1999). This limitation is cogently expressed by the Michigan Court of Appeals in *Schumacher* as follows: "The inference that the grantor intended to allow for modification of the easement as technology develops is consistent with the essence of easements by necessity—allowing individuals to make reasonable use of their property, so long as it does not unduly burden the servient estate." 663 N.W.2d at 924; *see also Ashby*, 229 P.3d at 1218 ("[I]f the severance occurred at a time prior to the general use of motor vehicles and electric power, an easement by necessity may still allow for 'reasonable technological developments' as long as the use does not cause unreasonable damage or interference with the rights of the servient estate owner.").

Based on this authority, we hold that, as a matter of law, under the "reasonable necessity rule" the width of an existing easement by necessity may be expanded without the consent of the servient landowner. We also hold, however, that the limiting principle underlying this rule dictates that modifications to such easements for the beneficial enjoyment of the dominant estate must not create unreasonable burdens on the servient estate. Accordingly, when adjudicating a dispute over such proposed modifications, as here, the trial court must balance the benefits and burdens relative to both estates in deciding upon what modifications, if any, will be approved. *See Bartholomew*, 459 A.2d at 980 (directing trial court to "strive for a balancing of interests in fashioning" the easement by necessity).

### B. REASONABLENESS OF MODIFICATIONS TO EASEMENT

We now turn to Palmer's alternative argument that the circuit court erred by granting Yancey the right to widen its easement by necessity over the Access Road for use by tractor-

trailers. So modifying the easement to accommodate tractor-trailers, she asserts, unreasonably increases the burden on the Palmer Property.

This challenge to the reasonableness of the court-approved modifications to the easement presents an issue of fact.[13] *See Keen*, 203 Va. at 180, 122 S.E. at 548; *see also Morrell,* 622 A.2d at 1160-61; *Beck*, 640 A.2d at 250; *Bartholomew*, 459 A.2d at 980. "Because the circuit court heard the evidence ore tenus, its factual findings are entitled to the same weight as a jury verdict, and [we are] bound by [its] findings of fact unless they are plainly wrong or without evidence to support them." *Jean Moreau & Assocs. v. Health Ctr. Comm'n*, 283 Va. 128, 142-143, 720 S.E.2d 105, 113 (2012) (quoting *Mulford v. Walnut Hill Farm Group, LLC*, 282 Va. 98,

---

[13] In closing argument to the circuit court, Palmer's counsel asserted in reference to this alternative argument that the issue "comes down to . . . a question of fact about what's reasonably necessary." Accordingly, her counsel went on to assert: "I've argued that a tractor trailer is not reasonably necessary. What's reasonably necessary for Yancey's enjoyment is to log as they have in the past. Being a case in equity, I ask the [c]ourt to balance the equities." He then argued that "the balance of the equities would be tipped if Yancey was allowed to expand into Ms. Palmer's property, taking away her land and rocks and her trees." Consistent with this argument, Palmer made the following related written objections to the circuit court's final order: "[t]he [c]ourt abused its discretion by finding that [Yancey's] use of tractor trailers is a reasonably necessary use of the road across [Palmer's] property," and "[t]he [c]ourt abused its discretion by creating an order that unreasonably burdens [Palmer]."

Contrary to these representations to the circuit court and objections to its ruling, Palmer has asserted to this Court on brief that this reasonableness inquiry presents a question of law. There, she argues that the expansion of the easement increases the burden on the Palmer Property, and that any increase in the burden without the servient landowner's consent is prohibited by law. Palmer's counsel, however, conceded at oral argument that the reasonableness of modifications to the easement to accommodate tractor-trailers is an issue of fact. Her argument on brief to the contrary is nonetheless waived because that is not how she framed her argument to the circuit court and her objections to its finding that Yancey's use of tractor trailers was reasonably necessary. *See* Rule 5:25. That argument is also essentially a reformulation of Palmer's argument under her first assignment of error that we addressed and rejected in Part II.A., *supra*.

19

106, 712 S.E.2d 468, 473 (2011)); *see* Code § 8.01-680. "[U]nder [this] standard of review applicable to judges sitting as factfinders no less than jurors, we review factfinding with the highest degree of appellate deference." *Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 117, 795 S.E.2d 875, 877 (2017) (citation and internal quotation marks omitted). In addition, we view the evidence and all reasonable inferences drawn from it in the light most favorable to Yancey, as the prevailing party at trial. *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 423, 732 S.E.2d 690, 699 (2012).[14]

Guided by this standard, we hold that the circuit court's findings of reasonable necessity for Yancey's use of tractor-trailers to transport its timber, and for the modifications to its easement by necessity to accommodate such use, are not plainly wrong, and they are amply supported by the evidence. Furthermore, in reaching this conclusion, we reject Palmer's argument that these modifications will unreasonably burden the Palmer Property.

### 1. Yancey's Use of Tractor-Trailers

As to the circuit court's approval of Yancey's use of tractor-trailers, separate and apart from the court's approval of the easement modifications to accommodate them, we reiterate that the standard is not whether their use is of "absolute necessity" but rather whether their use is of "reasonable and practicable necessity." *Smith*, 143 Va. at 164, 129 S.E. at 276.

The circuit court's finding that tractor-trailers are reasonably and practicably necessary for Yancey's timbering operation is supported by the testimony of Emmett and Endsley. Both of

---

[14] *See also Adams v. Allen*, 202 Va. 941, 946, 121 S.E.2d 364, 368 (1961) ("A [factfinder] should be permitted to determine a case if the evidence is in conflict as to the [dispositive facts], or if reasonable men might draw different conclusions from the facts, or if the conclusion is dependent upon the weight to be given the testimony." (citing *Hobbs v. Thorns*, 195 Va. 639, 646, 79 S.E.2d 854, 857 (1954); *Wilkins v. Davis*, 158 Va. 763, 770, 164 S.E. 649, 651 (1932)).

them testified that using tractor-trailers—as opposed to ten-wheel logging trucks—is the most efficient way to haul the logs from the Yancey Property over the Access Road to State Route 736, and from there to Yancey's sawmill.

Moreover, they explained, using tractor-trailers is, in fact, the only way to haul the pine logs at full-length for processing, as the lumber market demands. Endsley further explained that the industry standard is to use tractor-trailers for hauling logs (both pine and hardwood) for an operation covering as many acres of timber as will be harvested on the Yancey Property. Only much smaller timbering operations now use ten-wheel trucks for economic reasons, which is consistent with Emmett's statement that he rarely sees a load of logs being hauled to Yancey's sawmill with a ten-wheel truck. In fact, he does not recall seeing one in the last three years. Furthermore, according to Emmett, if Yancey were limited to using ten-wheel trucks to haul the logs from the Yancey Property, it would require 222 additional trips to Yancey's sawmill.

As to processing the pine logs, Emmett testified that Yancey's newest equipment at its sawmill was designed to cut the logs at full length whereas its old equipment dating back to the 1970's is only capable of processing shorter logs. In terms of efficiency, Yancey can "manufacture five to seven logs for every one that goes through the old [equipment]." In addition, the old equipment is "not all that reliable," Emmett explained, and he did not believe that it would be feasible to use the old equipment to process the 83 acres of pines to be harvested from the Yancey Property.

In terms of impact on the Access Road, Endsley explained that hauling the timber from Yancey's property using ten-wheel trucks will, of course, require "more trips" whereas "[i]f you can do it with . . . tractor-trailers, then your impact is going to be reduced because you're eliminating a lot of traffic."

21

2. Modifications to Access Road to Widen Easement

The evidence also supports the circuit court's approval of the specific modifications to the Access Road to widen Yancey's easement. The evidence shows not only that these limited modifications are reasonably necessary to accommodate tractor-trailers, but also that the modifications will not unreasonably burden the Palmer Property.

The Access Road, also referred to in the final order as the "roadbed," extends across the Palmer Property at various widths for a distance of approximately 838 feet. To accommodate tractor-trailers on this section of the Access Road, the order grants Yancey the right to widen the roadbed in three limited locations. Significantly, this leaves two-thirds of the roadbed, totaling approximately 559 feet, as is, in terms of the various widths of the roadbed along the way (ranging from 10 feet to 15 feet).[15] Thus, while the court granted Yancey a 20-foot wide easement by necessity over the Access Road in the final order, the order makes clear that "[t]he roadbed itself cannot be altered or modified except as set forth in this [o]rder." The portion of the easement extending beyond the actual width of the roadbed at any given location, as the order also makes clear, is provided solely for purposes of performing maintenance to the roadbed, such as trimming trees and overgrowth that "are rubbing, interfering with or obstructing the path of vehicles traveling over the [e]asement."

The first section of the roadbed that Yancey is permitted to widen pursuant to the final order extends from the entrance to the first station marker located approximately 37 feet from the entrance.[16] The entrance may be widened to 40 feet, with the roadbed then "taper[ing] back" to a

---

[15] *See infra* n. 17.

[16] These "station markers" correspond to the first two of thirteen courses and distances shown on a plat of the Access Road over the Palmer Property at various points, beginning with the first station marker at the entrance and ending with the thirteenth station marker at the

width of 20 feet at the second station marker. Regarding these modifications, Endsley testified that the entrance needs to be widened to 40 feet in order for tractor-trailers to enter and exit at that location. Otherwise, the wheels of the trailers would run off the edge of the roadbed in making the turn. According to Endsley, the entrance was, in fact, inadequate even for the ten-wheel trucks that had used it in conjunction with the recent timbering on the Campbell Property. Based on the tire tracks, he determined that those trucks were "tracking off the sides of the road" when turning onto and off of State Route 736. So for "any kind of logging traffic, short or long," Endsley stated, the entrance needs to be made "a little wider [on each side] so that those trucks are on stone." Based on Foster's testimony that the entrance is currently 30 feet wide, this modification can be made by extending the entrance five feet on each side.

The next section of the roadbed that Yancey is permitted to widen is located between the seventh station marker, which is approximately 451 feet from the entrance, and the eighth station marker, for a distance, again, of approximately 37 feet.[17] The modifications would be on the north side of the roadbed, starting on the west side of a stream (heading toward the Campbell Property) that crosses the roadbed at that location. After providing that the stream crossing "may be armored and reinforced using stone," the order provides that the roadbed "may be shifted three feet into the berm [extending to the eighth station marker]. It may be stoned and the trees may be trimmed but not removed." Endsley testified in reference to these modifications that

---

boundary line with the Campbell Property. The plat was attached to and incorporated into the final order by agreement of the parties.

[17] The final order does not authorize any modifications to the width of the roadbed between the first station marker and the seventh station marker, for a distance of approximately 414 feet. It also authorizes no such modifications to the last section of the roadbed between station marker twelve and station marker thirteen (the Palmer Property boundary line), for a distance of approximately 145 feet.

23

widening the roadbed at this location, along with stoning the bed of the stream, are needed for purposes of reducing "water quality issues." Doing so, Endsley explained, would enable truck traffic (both ten-wheel trucks and tractor-trailers) to travel through the stream "on a nice straight line as narrow as possible so we keep the impacts [to the bed of the stream] low." These measures, according to him, will eliminate the significant erosion that is occurring along the stream crossing, which is causing the stream to get "wider and wider" as it "wash[es] up the road." He also indicated that this would bring the stream into compliance with Virginia Department of Forestry regulations.

Finally, the third section of the roadbed that Yancey is permitted to widen is located between the eighth station marker, which is approximately 488 feet from the entrance, and the twelfth station marker, for a distance of approximately 206 feet. The modifications there include reducing two rock outcroppings (the "rocks") to grade level and straightening the roadbed, for a maximum road width of eighteen feet (which includes the width of the roadbed as it now exists). (Id.) The rocks are located along the edge of the north side of the roadbed projecting outwardly to form part of an ascending convex curve, where the width of the roadbed narrows to eight feet. Cutting down the rocks would straighten out the curve. In his extensive testimony regarding these modifications, Endsley explained that the modifications were necessary given the fact that, because of the rocks, even the ten-wheel trucks were forced "to swing wide" over against the trees along the bank of the stream on the south side of the roadbed, which was "degrading" the shoulder of the roadbed on that side. Those trucks, however, were "still not clearing the rock." As he described it, they were "rubbing hard against the rock. You can see black tire marks on it." This meant that the sidewalls of the tires were "definitely [being] wor[n] off," he determined, so "you got tire failure that's going to happen at some point. You're also going to

24

bend some rims."[18] By eliminating the rocks, "it would keep the trucks in the roadway." But if this section of the roadbed remains as is, Endsley concluded, the shoulder on the south side "is going to further degrade" and "[a]t the very least" it may result in a truck "tip[ping] over against the trees." It was thus Endsley's opinion that, whether it is tractor-trailers or ten wheel trucks that are used to haul timber over the Access Road, the rocks still need to be eliminated and the roadbed widened at that location.

In sum, the circuit court's judgment granting Yancey the right to make the above-described modifications to widen its easement by necessity for use by tractor-trailers was neither plainly wrong nor without evidence to support it. Viewed in the light most favorable to Yancey, the evidence shows that such use of the easement and the modifications to accommodate that use are reasonably necessary for the benefit of the Yancey Property. At the same time, the evidence shows that the modifications will not create an unreasonable burden on the Palmer Property. Indeed, the evidence in fact shows that, as to each of the three locations at which Yancey was granted the right to widen the easement, such modifications would be needed even if Yancey were planning to use only ten-wheel trucks to transport its timber.[19] Thus, we certainly cannot

---

[18] Endsley explained this in terms of how trucks "track" when going around a curve. With a tractor-trailer, the back set of wheels on the trailer follow the truck but not in the same line. They "track" to the inside as the front of the truck travels around the curve. "So when we're looking at clearances on a road, we have to allow for that kind of curve widening so that the trailers will track behind the trucks" within the roadway. As to ten-wheel trucks, Endsley went on to explain that they "don't tend to track as hard because it's all one frame." But they still track "because they're stretched out [so] the back end of the truck tends to cut on the inside," just not as much as a tractor-trailer. "That's why, in the case of this eight-foot-wide stone place," he stated, "we saw that real hard rubbing against the rocks" by the ten-wheel trucks.

[19] Though not an issue with regard to widening the easement, it is worth noting that the one tree that the circuit court gave Yancey permission to remove, located on the south side of the roadbed between the sixth and seventh station markers as set forth in the final order, was already "obstructing the path" of the ten-wheel trucks, as evidenced by the bark that had been knocked off by them at a spot 10 to 12 feet high on the tree.

say that the circuit court, by granting Yancey the right to make these limited modifications, failed to maintain a balance in the interests of the parties, respectively, as dominant and servient landowners. *See Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 790 S.E.2d 493, 499 (2016) ("This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." (quoting *Sauder v. Ferguson*, 289 Va. 449, 459, 771 S.E.2d 664, 670 (2015)).

## III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*

JUSTICE MIMS, concurring in part and dissenting in part.

Yancey did not prove by clear and convincing evidence that it is reasonably necessary to use tractor-trailers to harvest the timber on its property, but only that doing so would maximize its profits. Accordingly, I respectfully dissent.

A court once observed that "[f]ew things are as certain as death, taxes and the legal entanglement that follows [the conveyance] of landlocked real estate." *Bob Daniels & Sons v. Weaver*, 681 P.2d 1010, 1013 (Idaho Ct. App. 1984). Many of these entanglements involve the creation and scope of easements implied by necessity. When "determining whether an easement [by necessity] should be implied," "[t]he fact of the necessity . . . is of great importance." *Jennings v. Lineberry*, 180 Va. 44, 48, 21 S.E.2d 769, 771 (1942) (quoting 17 Am. Jr. *Easements* § 48 (1938)). This requisite "necessity" is "not a physical or an absolute necessity but a reasonable and practicable necessity." *Smith v. Virginia Iron, Coal & Coke Co.*, 143 Va. 159, 164, 129 S.E. 274, 276 (1925). Importantly, the reasonable necessity justifying either the

26

creation of an easement or the expansion of its scope must be proven by clear and convincing evidence and generally cannot be proven if other access is available, even though that access is less convenient or more expensive. *American Small Bus. Inv. Co. v. Frenzel*, 238 Va. 453, 456-57, 383 S.E.2d 731, 734 (1989).

Without question, we have recognized easements by necessity in circumstances where the dominant estate would otherwise be unfit for its foreseeable beneficial use despite the existence of an alternative access. But in those cases, the evidence clearly and convincingly demonstrated that using the available access would be economically unreasonable. In *Smith v. Virginia Iron, Coal & Coke Company*, for example, the Court considered whether the defendant was entitled to an easement by necessity over neighboring land to use when harvesting timber. 143 Va. at 163, 129 S.E. at 275-76. By the time of the litigation, the defendant had acquired land adjacent to its would-be dominant estate with frontage on a public highway at the top of a mountain. *Id.* at 166, 129 S.E. at 277. However, the evidence demonstrated, "without contradiction, that the construction of a . . . road up the mountain to the [public highway] would be wholly impracticable, *as the cost of construction would be more than the value of the timber to be hauled and the land on which it is located*." *Id.* at 167, 129 S.E. at 277 (emphasis added). Plainly, constructing such a road was not impossible, and the easement was therefore not absolutely necessary. Nevertheless, the Court held that this alternative access did not extinguish an otherwise valid easement by necessity. *Id.*[1]

---

[1] Similarly, the Colorado Court of Appeals declined to acknowledge an easement by necessity when there was "no evidence" that the cost of constructing an alternative access over available land would be "prohibitive, or grossly in excess of the value of the estate itself." *Le Satz v. Deshotels*, 757 P.2d 1090, 1093 (Colo. Ct. App. 1988); *see also D'Addario v. Truskoski*, 749 A.2d 38, 45 (Conn. Ct. App. 2000) ("It may be . . . that while access to the property is not absolutely cutoff, the circumstances . . . are such that the means of access available would not afford the landowner any real beneficial enjoyment of his property. Such a situation would arise

In accordance with the above principles, it was not necessary for Yancey to show that the use of tractor-trailers to harvest its timber is absolutely necessary. However, Yancey was required to do more than show that using ten-wheelers would be less efficient and more expensive. *MacCaskill v. Ebbert*, 739 P.2d 414, 419 (Idaho Ct. App. 1987) ("[O]ne seeking an easement need not show that a legally available route is absolutely impossible to use . . . [but] neither is it sufficient merely to show that the legally available route would be inconvenient or expensive. . . . Rather, an easement by necessity should be granted only if the difficulty or expense of using the legally available route is so great that it renders the parcel unfit for its reasonably anticipated use." (citation omitted)). The evidence, viewed in the light most favorable to Yancey, failed to do this.

While Yancey did not use tractor-trailers the last time it harvested the timber from the property, the evidence showed that the modern "industry standard" for a property of this size supports their use. Moreover, as Part II(B)(1) of the majority opinion notes, the testimony provided by Emmett and Endsley establishes that tractor-trailers would be "the *most efficient* way to haul the logs from the Yancey Property over the Access Road to [the public highway], and from there to Yancey's sawmill." (emphasis added). But an easement by necessity is not intended to ensure that the owner of landlocked real estate can efficiently maximize his profits to the detriment of his neighbor's enjoyment of her property. While the majority points to significant evidence demonstrating that Yancey's timber can be most efficiently harvested using tractor-trailers, there is no evidence demonstrating that the cost incurred by using ten-wheelers is so great when compared to the value of the timber that it would make timbering the Yancey

---

when the expense of making the means of access available would exceed the entire value of the property to which access was sought.").

28

Property unreasonable.

Yancey's trial attorney directly asked Emmett what he would do if his only option was "cutting [the pines] short and taking them out on smaller trucks." Emmett frankly stated, "I don't know" and that "[w]e'd have to look at it." He suggested that under those circumstances he might "put the timber up for sealed bids and let somebody else buy it," which is what Yancey does for the majority of its investment properties.[2] While Emmett testified that he would expect fewer bids for the timber under those circumstances, he admitted that "[t]here are people who . . . buy shorter pines."

This testimony not only shows that options other than using tractor-trailers may exist for harvesting the timber, but also that Yancey has not investigated the economic viability of these options. Moreover, beyond his general assertions that it is the industry standard to use tractor-trailers on a property of this size, and that using ten-wheelers would generally reduce the expected profit, Endsley likewise provided no testimony regarding the specific expense that would be incurred from using ten-wheelers to harvest the timber on the Yancey Property. In fact, Endsley admitted that even if tractor-trailers were not allowed on the Access Road, there would still be value in Yancey's timber.

"Courts must be very careful before decreeing upon one man's land in favor of another without compensation such an [e]ncumbrance as a way, permanently impairing that man's dominion and ownership, which next to life and liberty, is the most valuable of rights inhering in the citizen." *Crosier v. Brown*, 66 S.E. 326, 327 (W.Va. 1909). The cost associated with using

---

[2] Emmett testified that in addition to operating a sawmill, Yancey also owns approximately a dozen timber investment properties, including its property at issue in this case. Typically, Yancey sells the harvesting rights to the timber on its investment properties to other companies.

ten-wheelers may in fact be so great that Yancey's use of tractor-trailers is reasonably necessary. However, in my view, the evidence in this case does not rise to the level that justifies the expansion of an easement by necessity. As I conclude that Yancey has failed to prove by clear and convincing evidence that using tractor-trailers is reasonably necessary, I would reverse the circuit court's order to the extent that it allows for their use.[3]

---

[3] Because Endsley repeatedly testified that his recommended modifications to the Access Road would be necessary regardless of whether the Yancey Property was harvested using ten-wheelers or tractor-trailers, I do not dissent from Part II(B)(2) of the majority opinion.