UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Fulton and White
Argued at Buckingham, Virginia

BRIAN WESLEY BARGER, JR.

MEMORANDUM OPINION* BY
v.      Record No. 2188-23-2      JUDGE KIMBERLEY SLAYTON WHITE
SEPTEMBER 23, 2025

HUDSON HIGHLAND COLLECTIONS, LLC

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Jacqueline S. McClenney, Judge

David C. Reinhardt (Reinhardt Vandenbrook, PLLC, on briefs), for
appellant.

S. Keith Barker (S. Keith Barker, P.C., on brief), for appellee.

This appeal challenges the trial court's ruling that Brian Wesley Barger, Jr., a guarantor for

the debt owed by Restoration Builders, LLC, was required to pay the holder of the loan the

outstanding debt upon the default of Restoration Builders. Barger asserts, first, that Restoration

Builders was not in default and, second, that the holder of the loan could not enforce the guaranty

against him. We disagree and affirm.

BACKGROUND

This appeal arises from an attempt to collect a debt. There is a companion case to this

appeal. *Hudson Highland Collections, LLC v. Barger*, Record No. 0533-24-2.

Contracts

On May 16, 2018, lender South State Bank executed a Credit Agreement with borrower

Restoration Builders, LLC, to provide the latter with a $100,000 revolving line of credit. The

_____

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

Credit Agreement's terms lasted one year and provided that any unpaid amount be due at the end of that time. Brian W. Barger, the appellant here, and Thomas J. Flanagan ("Tom") signed the agreement as managers of Restoration Builders. Barger is also Restoration's president.

Barger, Tom, and Tom's father, Michael P. Flanagan ("Mr. Flanagan"), agreed to become guarantors of Restoration Builders' debt under the Credit Agreement should Restoration fail to fulfill its terms ("Guaranty"). The Guaranty allowed South Side Bank to assign the Credit Agreement and the Guaranty to anyone without notice to the three guarantors.

South Side Bank assigned the Credit Agreement and the Guaranty to Hudson Highland Collections, LLC ("Hudson"), the appellee here, on May 16, 2019, exactly one year after the Credit Agreement was signed.

Mr. Flanagan and his wife Melia co-own all interest in Hudson as tenants by the entirety. Hudson was incorporated on May 13, 2019, three days before it purchased the Credit Agreement and Guaranty from South Side Bank. It was formed to purchase Restoration Builders' debt under the Credit Agreement.

A loan details internal form created by South Side Bank in October 2019 identified three instances in which it had assessed late charges against Restoration in July 2018, April 2019, and May 2019. The loan details form identified that the transaction amount was $95,834.98 and the interest was $441.64.

Default

On May 16, 2019, the Credit Agreement reached its date of maturity, though Restoration Builders had failed to make any payments on it. That day, Hudson sent Barger a letter demanding that he pay $95,834.98, the "full amount of the sum due from you as guarantor," by the end of the day. Hudson did not demand any payments from Mr. Flanagan or Tom, the other

two guarantors of the Credit Agreement.  Barger failed to pay, and Hudson brought this suit the following month.

Suit

Hudson sued Barger for breach of the Credit Agreement in June 2019.  It requested the amount owed, along with interest and fees.  In July 2019, Barger filed a third-party complaint asking for one-third contributions toward his liability from Mr. Flanagan and from Tom as guarantors of the Credit Agreement.

In July 2020, Tom filed for bankruptcy.  Barger and Tom agreed to dismiss the third-party complaint's demand for contribution from Tom.  In February 2021, the trial court granted Barger's motion to bifurcate his third-party complaint from Hudson's underlying claim and continue the third-party complaint to another date.

On January 11, 2021, Hudson sent Barger a letter related to its underlying suit.  The letter advised Barger that Hudson had "extended the time in which" Restoration could make payments on the Credit Agreement debt.  It noted, "The extension does not affect the obligation of you, Brian Wesley Barger, Jr., to make full payment of the amount due under the [C]redit [A]greement when it was demanded."  The letter further advised Barger that any payment Restoration might make to Hudson on the debt in a separate interpleader action would be credited against the amount Barger must pay as guarantor, an inducement for Barger, Restoration's president, to get Restoration to pay some of what it owed prior to judgment.

On February 22, 2021, the bench trial of Hudson's claim took place.  Barger argued that Restoration Builders had not breached the Credit Agreement because Hudson had extended the repayment deadline to an unspecified date.  He further argued that by purchasing the Credit Agreement with his alter ego Hudson, Mr. Flanagan created a "union of debtor and creditor" in himself, which "operates to discharge the debt."  Consequently, Barger continued, Mr. Flanagan

could not sue him for breach of contract, since the debt is gone, but only for contribution to recover Barger's share of the debt that Mr. Flanagan paid in full when he bought the Credit Agreement from South Side Bank.

The following month, Hudson filed its first motion for sanctions on Barger for failing to comply with Code § 8.01-271.1 by filing motions with no legal or factual basis. The court did not rule on Hudson's motion for sanctions.

Following a bench trial, the court ruled for Hudson and awarded it $95,834.98, $441.64 in interest, and $64,642.21 in attorney fees in a March 9, 2021 order. The court amended the interest amount to $14,281.54 in a March 26, 2021 order. These March orders did not contain findings of fact but only the ruling for Hudson and the damages due from Barger.

Barger appealed the March 9 and March 26 orders to the Supreme Court of Virginia. The Supreme Court awarded the appeal but then dismissed it in February 2022 after finding that the orders were "not final, appealable orders."[1]

Third-Party Complaint

Barger's third-party complaint against Mr. Flanagan for contribution remained to be litigated. On January 5, 2023, Barger filed a motion for sanctions against Hudson for improperly issuing a garnishment summons against Restoration Builders. He also filed a motion to reconsider, vacate, or set aside the trial court's final March 26 order awarding judgment to Hudson on the underlying suit.

---

[1] The Supreme Court's dismissal order states that it granted one of the parties' "motion to review finality and appealability of orders" and dismissed the appeal accordingly. But it did not expressly state its reason for finding the orders not to be final, and the motion does not appear in the record. Barger assumes in his pleadings the reason is that his third-party complaint remained to be litigated.

In August 2023, Hudson filed its second motion for sanctions against Barger for alleged misrepresentations to the court. The following month, Barger filed a supplemental motion to reconsider, vacate, or set aside the court's final March 26 order.

Trial for Barger's third-party complaint was set for November 17. But on November 8, he moved to nonsuit his third-party complaint under Code § 8.01-380. The court granted the nonsuit the following day and dismissed the third-party complaint without prejudice. The court's November 9 order granting the nonsuit did not purport to retain jurisdiction to decide any pending motions.

In December 2023, Mr. Flanagan and Hudson filed two joint motions, one to modify an earlier protective order, the other requesting sanctions against Barger for the third time. The same day, Hudson filed a motion asking the court to add $5,797.03 to the award in the March 26 final order to reflect the fact that payments were only made in the summer of 2022, "long after" the final order of March 26, 2021, and further requesting that the court rule on the two joint motions it had just filed.

In February 2024, the trial court held a hearing on these and other pending motions. But the court asked the parties to first address whether its November 2023 nonsuit order was final, thereby terminated its jurisdiction over the case and related motions twenty-one days after the nonsuit order's entry. On February 27, the court ruled that the November 2023 nonsuit order was indeed final, ending its jurisdiction over the case pursuant to Rule 1:1 ("final order"). Hudson moved the court to suspend, reconsider, and vacate the final order, which the trial court denied on March 18.

On appeal,[2] Barger assigns error to the court's orders of March 9 and 26, 2021, in which the court ruled for Hudson on the underlying breach of contract claim. Hudson and

---

[2] Barger timely noted his appeal to this Court in December 2023.

Mr. Flanagan appeal the court's final order dismissing the case for lack of jurisdiction in the companion case.

Barger's Motion to Review the Nonsuit Order's Finality

Barger, despite appealing this case, has filed a motion in this Court to review the finality of the November 2023 nonsuit order. He argues that it was not a final, appealable order and asks us to dismiss the appeal without prejudice and remand it to the circuit court. Hudson also argues that the nonsuit order was not final in its first assignment of cross-error. Barger notes that several motions[3] remained pending and that "none of the parties or court" viewed the nonsuit to be final at the time it was made, with the parties continuing to litigate "well beyond" the twenty-one days after the nonsuit. He argues that the nonsuit order does not meet the definition of a final order because the order left nothing to be done "except the ministerial execution of the court's judgment." Rule 1:1(b).

ANALYSIS

First, we consider Barger's motion and decide whether the nonsuit order was final. We then turn to Barger's assignments of error. His first two concern whether Restoration breached the Credit Agreement by defaulting under its terms. The remaining assignments posit that Hudson was Mr. Flanagan's alter ego, which either extinguished the debt or at least limited Hudson to collect only a proportional share of the debt from Barger, not the entire sum owing.

A. Whether the Nonsuit Order was Final

Before considering the merits of Barger's appeal, we must address whether the nonsuit order entered on November 9, 2023, was final. Both parties urge us to find that it was not. Hudson cites *Monroe v. Monroe*, 302 Va. 387 (2023), to argue that the trial court had a "to-do

---

[3] Both sides had sanctions motions pending against the other, in addition to other motions relating to the March 2021 orders.

- 6 -

list" of pending motions prior to entering the nonsuit order which negates the possibility that the court had nothing left to do under Rule 1:1(b). The litigant in *Monroe* argued that an ostensibly final order could not be final "because the court had not yet ruled on her motion for sanctions." 302 Va. at 398. Our Supreme Court responded that the "problem with this argument is not its logic but its sense of timing," as there was in fact no motion for sanctions pending when the court entered the final order. *Id.* Here, conversely, there were several pending motions for sanctions and other motions when the court entered the nonsuit order in November 2023. Additionally, Hudson states that these pending motions were related to the underlying claim, whereas the nonsuit dismissed only the third-party complaint.

"Nonsuit orders are generally treated as final orders for purposes of Rule 1:1." *Kosko v. Ramser*, 299 Va. 684, 687 (2021). "A final order is one which 'disposes of the entire action and leaves nothing to be done except the ministerial superintendence of execution of the judgment.'" *Id.* (quoting *Super Fresh Food Mkts. of Va., Inc. v. Ruffin*, 263 Va. 555, 560 (2002)). An order disposes of the entire action if it disposes of the "claims in the complaint and any counterclaims." *Id.* at 688. It is certain that filing a post-trial motion "does not suddenly transform an otherwise final order into a nonfinal order." *Id.* at 689.

"[U]nder Rule 1:1, 'final [orders] . . . remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer.'" *Super Fresh*, 263 Va. at 560 (third alteration in original) (quoting Rule 1:1(a)). "The running of the twenty-one day time period prescribed by Rule 1:1 may be interrupted only by the entry, within the twenty-one day time period, of an order modifying, vacating, or suspending the final judgment order." *Kosko*, 299 Va. at 687 (quoting *Super Fresh*, 263 Va at 560). The Supreme Court of Virginia has insisted that an actual written order is necessary to extend the twenty-one day period, even holding that a court's oral agreement to grant a post-trial motion did

not extend the twenty-one day period because "the court [did not] enter[] the written judgment order" granting the motion until the twenty-one day period had already passed. *Id.* (citing *Wagner v. Shird*, 257 Va. 584, 586-88 (1999)).

Here, the trial court's order to nonsuit Barger's third-party complaint was final. The order disposed of the third-party complaint's "entire action" because it dismissed the only claim in the third-party complaint—Barger's claim for contribution from Mr. Flanagan. The nonsuit order did not purport to retain jurisdiction, nor did the court issue any subsequent order to interrupt the running of the twenty-one day period. That period ran out on November 30, 2023, at which point the circuit court lost jurisdiction over the third-party complaint and, consequently, the whole case. The parties' filing of any "ancillary" or post-trial motions after this date could not have "suddenly transform[ed]" the now-final order into a nonfinal order. *See Kosko*, 299 Va. at 689. And importantly, the dismissal of the third-party complaint left the court with nothing else to do on the whole case since, following its March 2021 orders disposing of the underlying claim, all that the court had left to do was to decide Barger's third-party claim.

Thus, the only way in which the nonsuit order might not be final is if one or more motions already pending prior to the order's entry rendered it nonfinal. Indeed, the parties had several outstanding motions at the time the nonsuit order was entered: Barger's January 2023 motion for sanctions; his January 2023 motion to reconsider the March 26 order in favor of Hudson on the underlying claim, taken under advisement in August; Hudson's first motion for sanctions in March 2021, and its second motion for sanctions in August 2023; and Barger's September 2023 supplemental motion to reconsider the March 26 order.

The Supreme Court of Virginia has held that a trial court may only rule on a pending motion for sanctions within twenty-one days of the entry of a nonsuit order. *See Williamsburg Peking Corp. v. Xianchin Kong*, 270 Va. 350, 355 (2005). A nonsuit order "'is sufficiently

imbued with the attributes of finality to satisfy the requirements of Rule 1:1'" and so, "like all final judgments, remain[s] under the control and jurisdiction of the trial court for [twenty-one] days after the date of entry." *Id.* at 354 (quoting *James v. James*, 263 Va. 474, 481 (2002)). The Court later concluded that "our decision in *Williamsburg Peking* holds that a circuit court retains jurisdiction to consider a party's motion for sanctions for [twenty-one] days after entry of a nonsuit order," provided the nonsuit order does not explicitly state the circuit court's "intent to retain jurisdiction to consider the motion for sanctions beyond" the twenty-one-day period. *Johnson v. Woodard*, 281 Va. 403, 409 (2011).

The Court's statement in *Monroe* that the litigant's logic was not the problem does not displace the clear case law establishing that a pending motion does not extend the twenty-one days of continuing jurisdiction over a final order or otherwise render that order nonfinal. A nonsuit order is final and divests the trial court of jurisdiction to hear any related motions twenty-one days after entry absent written language to the contrary. Here, the court never reserved more time to rule on the pending motions. Thus, the court's conclusion set forth in its February 2024 order noting that its jurisdiction over Barger's third-party claim was at an end is correct. We deny the invitation from the parties to hold otherwise.

### B. Whether Restoration Builders Breached the Credit Agreement

Barger's first and second assignments of error argue that the trial court erred in finding Restoration Builders liable for breaching the Credit Agreement. Assignment of error 1 asserts that there is no evidence that Restoration defaulted on the agreement's terms. First, Barger argues that Restoration's duty to make minimum monthly payments under the agreement was "predicated on periodic statements" from the creditor identifying the payments' due dates. He maintains that since Hudson did not prove "the delivery or generation" of these periodic statements, Restoration's minimum payment obligations never became due, and Restoration's

- 9 -

"merely having a balance attributable to the Credit Agreement" is not enough to prove default. Second, though the Credit Agreement's terms had a one-year maturity date, Barger asserts that Hudson "explicit[ly] and indefinite[ly]" extended the date in a January 2021 letter to Barger, which the Credit Agreement permitted. Assignment of error 2 builds on these arguments to assert that, because Restoration did not default on the Credit Agreement, Barger cannot be liable as guarantor for Restoration's debt under the agreement.

Hudson responds that the trial court did not err in finding that Restoration Builders was in default. First, Hudson points to the Guaranty, which waived Barger's right to require the Credit Agreement's creditor to make a demand for payment prior to holding Restoration in default. Thus, Hudson states that Barger waived any argument that the periodic statements were required to put Restoration in default. Next, Hudson asserts that Barger's pleadings concede that Restoration had defaulted on the Credit Agreement. For example, Barger's answer admits the allegation in Hudson's complaint that Restoration had "not made the payment due on the Credit Agreement," and pleaded that the "principal debt now owed on the Credit Agreement" was $95,834.98. Furthermore, Hudson points to evidence showing that South Side Bank assessed late charges on Restoration three times prior to assigning the Credit Agreement to Hudson. Hudson argues that the late charges "affirmatively" show default by showing that Restoration missed payments "when due," violating a term of the Credit Agreement. Last, Hudson states that its January 2021 extension letter to Restoration did not release Barger from his obligation under the Guaranty to answer for Restoration's debt. The extension was made a year and a half after Hudson filed suit and was meant to benefit Barger, given Restoration's insolvency, by giving him the chance to "act as Restoration's president and pay Hudson before trial, thereby relieving Barger as guarantor of any obligation to pay." In other words, the extension was simply to allow any payments that Restoration might make during the suit to be credited to Barger; since

Restoration made no payments, Barger's "independent obligation" to pay the remaining debt was not changed. The extension letter, Hudson sums up, did not undo Restoration's default of the Credit Agreement.

"When a trial court renders judgment after a bench trial, we cannot set aside that judgment as contrary to the evidence 'unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.'" *Moncrieffe v. Deno*, 76 Va. App. 488, 496 (2023) (quoting Code § 8.01-680). "When judges sit as factfinders, 'no less than jurors,' we give their determinations 'the highest degree of appellate deference.'" *Id.* (quoting *Palmer v. R.A Yancey Lumber Corp.*, 294 Va. 140, 158 (2017)). "We likewise 'view the evidence and all reasonable inferences drawn from it in the light most favorable to . . . the prevailing party at trial.'" *Id.* (alteration in original) (quoting *Palmer*, 294 Va. at 159). But the "interpretation of a contract is a question of law that this court reviews de novo." *Bolton v. McKinney*, 299 Va. 550, 554 (2021) (citing *Schuiling v. Harris*, 286 Va. 187, 192 (2013)). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used." *Id.* (quoting *Schuiling*, 286 Va. at 192).

A guaranty is "an independent contract, by which the guarantor undertakes, in writing, . . . to be answerable for the debt . . . of some other person who is primarily liable to pay or perform" but fails to do so. *McDonald v. Nat'l Enters.*, 262 Va. 184, 189 (2001) (quoting *B.F. Goodrich Rubber Co., Inc. v. Fisch*, 141 Va. 261, 266 (1925)). "In an action to enforce an independent contract of guaranty," the creditor "is proceeding on the guaranty, not on the underlying" debt obligation. *Id.* "Thus, to recover on a guaranty," the creditor must show "the existence and ownership of the guaranty contract, the terms of the primary obligation and default on that obligation by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty contract." *Id.* (citations omitted). Here, the existence and ownership of

- 11 -

the Guaranty and Barger's nonpayment are not contested. The question that remains is whether Restoration defaulted on the Credit Agreement.

Barger's argument in assignments of error 1 and 2 is that Hudson did not meet its burden of proving that Restoration defaulted even though Restoration still had a "balance or debt" under the Credit Agreement. He relies on the lack of periodic billing statements in the record to argue that Hudson failed to prove default. But this argument assumes that the only way that Restoration could breach the Credit Agreement was if it first received monthly billing statements. The Credit Agreement's "Minimum Payment" paragraph does state that Restoration shall make monthly payments "on or before the due date indicated on [Restoration's] periodic billing statements." But the same paragraph also says that Restoration "will make 11" minimum payments, that these payments will be "equal [to] the amount of [Restoration's] accrued finance charges," and that they "will be due monthly." The use of "will" creates an obligation for Restoration to make monthly payments. Though periodic statements establish when these payments are due, the agreement does not state that failing to deliver or generate them relieves Restoration of any obligation to pay each month. Thus, their absence in the record is not dispositive of whether Restoration defaulted.

Additionally, the "Minimum Payment" paragraph provides that if the minimum payments are not made, Restoration "will then be required to pay the entire balance owing in a single balloon payment." It follows that this paragraph was designed to obligate Restoration to make 11 monthly payments over the agreement's one-year life and then a final payment of any remaining debt on the maturity date at the twelfth month. The agreement even states that all indebtedness not already paid "will be due and payable upon maturity." The maturity date was May 16, 2019, at which point evidence shows Restoration owed $95,393.34 in principal and $441.64 in interest. It strains the contractual language to assume that Restoration's duty to make

the monthly payments or the final balloon payment is absolutely conditioned on proof that it received periodic statements.

Furthermore, the Credit Agreement defines "Default." One way in which Restoration may default is if it "fails to pay a Minimum Payment when due," but another way is if it "violates any provision of this Agreement." Restoration did not make a balloon payment at the maturity date of the entire balance it owed. Sufficient evidence supports the court's implicit finding that Restoration violated at least this balloon payment obligation, regardless of the record's lack of periodic statements.

And finally, we address Barger's argument that Hudson's extension letter to Restoration indefinitely extended Restoration's obligation to pay and demonstrates Hudson's failure to meet its burden of supplying any evidence that Restoration defaulted. Barger acknowledges that Restoration became liable for "all unpaid amounts on the credit line" on the maturity date, May 16, 2019, but asserts that this letter shows that Hudson extended this date. Yet the extension letter only advised Barger that Hudson had "extended the time" for repayment for Restoration, the primary debtor, but that the "extension does not affect the obligation of you, . . . Barger," as a guarantor. The extension was meant to benefit Barger by crediting him with any payments by Restoration, not to remove Restoration from the default into which it had fallen more than a year and a half earlier. Here again, enough evidence supports that Hudson proved Restoration's default despite advising Barger that it had extended Restoration's time for payments.

The evidence is sufficient to show Restoration's default, which triggered Barger's obligation to answer for its debt. We therefore reject his assignments of error 1 and 2.

C. Whether Hudson is Mr. Flanagan's Alter Ego

Barger's third assignment of error argues that the trial court erred in finding "by necessity" that Hudson was not the alter ego of Mr. Flanagan.[4]  Assuming that Hudson is Mr. Flanagan's alter ego, Barger asserts that Hudson/Mr. Flanagan's purchase of the Credit Agreement and Guaranty extinguished the debt "altogether" and limited Hudson to an action for contribution.  Alternatively, Barger states that "even if the extinguishment principal does not apply here," Mr. Flanagan/Hudson was a guarantor of the debt and therefore may only recover against his co-guarantor Barger for the latter's "proportionate" share.  However, it follows that if Hudson is not Mr. Flanagan's alter ego, both of these assertions fail.

Barger argues that Hudson was formed to gain an "unfair advantage" over Barger and to "evade" Mr. Flanagan's personal obligations.  In support, he cites several facts and dates.  Barger and Tom executed the Credit Agreement on May 16, 2018, and Mr. Flanagan signed the Guaranty alongside Barger and Tom on the same day.  Mr. Flanagan emailed South State Bank on May 6, 2019, asking if it was possible to buy the agreement in order to "go after one or more of the signatories for payment."  Then a week later, on May 13, Mr. Flanagan formed Hudson.  Mr. Flanagan testified that Hudson was initially formed to purchase the Credit Agreement, though it came to own two other debt agreements belonging to Tom.  At some point after acquiring the Credit Agreement and Guaranty, Hudson released Mr. Flanagan as a guarantor.  On May 16, the agreement's maturity date, Mr. Flanagan authorized Hudson's attorney to send the demand letter for the agreement's debt to Barger only.  These facts, Barger concludes, show that Mr. Flanagan formed Hudson to "take an unfair advantage of his only non-blood-related co-guarantor," Barger, and to "relieve himself of the personal obligation that he bore" under the

---

[4] Both parties agree that assignment of error 3 is dispositive of Barger's remaining assignments of error.

Guaranty.  Thus, Barger maintains, the trial court's March 2021 orders implicitly finding Hudson not to be Mr. Flanagan's alter ego are clearly erroneous.

Hudson posits that none of these facts prove clear error.  Regarding its formation, Hudson notes that Mr. Flanagan's May 2019 email stated he wanted to buy the agreement to go after "one *or more*" of the parties, not Barger alone.  It argues that this email only shows Mr. Flanagan's "potential" interest in purchasing the agreement, which in the end was purchased not by him but by Hudson.  Additionally, Mr. Flanagan's wife co-owns Hudson as a tenant by the entirety.  She testified that the two "make every decision together."  Relatedly, Hudson asserts that the "funds to capitalize Hudson" did not come from Mr. Flanagan alone but from a loan derived from property owned jointly by the couple.  These facts show that Hudson was not a "stooge or dummy" of Mr. Flanagan but a separate entity.  Regarding Barger's assertion that Hudson unfairly took advantage of him and the other guarantors, Hudson points to contrary evidence.  Hudson states that the reason it did not initially sue Mr. Flanagan's son, Tom, in addition to Barger was because it knew Tom to be insolvent and that his principal asset was beyond reach of creditors, being held jointly by Tom and his wife.  Then, "as a practical matter," Hudson pursued contribution from Tom in bankruptcy proceedings rather than in state court, where it would have "needlessly incurred legal fees" with "no likely recovery."  Hudson opines that these facts show a good reason for not pursuing Tom as a co-guarantor of Barger. Regarding its release of Mr. Flanagan as co-guarantor once it had purchased the agreements, Hudson argues that Barger failed to prove that this release was wrongful or fraudulent.  The Guaranty allows the creditor to "release" any guarantor "in any manner" the creditor may choose.

"The proposition is elementary that a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it."  *Cheatle v. Rudd's Swimming Pool*

*Supply Co.*, 234 Va. 207, 212 (1987). A shareholder's immunity is "a basic provision of statutory and common law," and to withdraw it by piercing the corporate veil is an "'extraordinary exception' to be permitted only when it becomes necessary to promote justice." *Id.* (quoting *Beale v. Kappa Alpha Order*, 192 Va. 382, 397 (1951)); *Transparent GMU v. George Mason Univ.*, 298 Va. 222, 245 (2019) (quoting *C.F. Trust, Inc. v. First Flight L.P.*, 266 Va. 3, 10 (2003)). "In Virginia, unlike in some states, the standards for veil piercing are very stringent" and they are only satisfied "in the most egregious circumstances." *C.F. Trust*, 266 Va. at 12. Piercing the corporate veil requires a showing that "the corporation is 'the alter ego, alias, stooge, or dummy'" of the shareholder sought to be held personally accountable. *Transparent GMU*, 298 Va. at 245 (quoting *RF&P Corp. v. Little*, 247 Va. 309, 316 (1994). It is justified where the shareholder "controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage" and "when the unity of interest and ownership is such that the separate personalities of the corporation and the individual[] no longer exist[s] and to adhere to that separateness would work an injustice." *Dana v. 313 Freemason*, 266 Va. 491, 500 (2003).

"Whether to allow piercing the veil of a corporation is a mixed question of law and fact and, accordingly, we review the trial court's application of the law *de novo* while giving deference to the trial court's factual findings." *Id.* at 499 (citing *Caplan v. Bogart*, 264 Va. 219, 225 (2002)). Though we review its application of the law de novo, the trial court's "decision whether to disregard the corporate [veil] depends largely upon resolution of questions of fact with the burden of proof resting upon the party seeking to pierce the veil." *Cheatle*, 234 Va. at 212. "A trial court's ruling on such questions will be regarded as presumptively correct and will not be overturned on appeal unless clearly erroneous." *Id.* at 212-13.

Here, the trial court's March 2021 orders were silent on whether Barger met his burden of proof to pierce Hudson's corporate veil. But by awarding judgment to Hudson, it impliedly found that he had not. We may not overturn this ruling unless the questions of fact on which it depends are clearly erroneous.

We affirm the trial court's refusal to grant the "extraordinary" remedy of piercing Hudson's corporate veil because sufficient evidence shows that Mr. Flanagan formed and used Hudson permissibly. The Credit Agreement's terms freely permitted South Side Bank to sell it to "another lender, entity, or person." The Guaranty committed each guarantor to "absolutely and unconditionally guarantee[ing] full and punctual payment and satisfaction" of Restoration's Credit Agreement debt. Like the Credit Agreement, it permitted South Side Bank to assign it. It is true that Hudson was initially formed to buy the Credit Agreement. But our Supreme Court has stated that the analysis should not "focus[] only on [the shareholder's] intent in incorporating" the corporation but must also "address [the] subsequent use of the corporation" too. *Greenberg v. Commonwealth ex rel. AG*, 255 Va. 594, 603 (1998). To that end, we note that Hudson may have been incorporated specifically to own the Credit Agreement but subsequently came to own other debts of Tom as well.

Barger argues that Hudson was formed "for the purpose of pursuing Barger" and to take "unfair advantage" of him as Mr. Flanagan's "only non-blood-related" co-guarantor. He points to Mr. Flanagan's May 2019 email to South Side Bank asking if it would be possible to buy the agreement and go after "one or more of the signatories"—Barger and Tom—for payment. But these words show only that Mr. Flanagan wanted to know if he could go after Barger, Tom, or both. Admittedly, Hudson's demand letter requested payment solely from Barger and not from Tom, and Mr. Flanagan stated, "I don't think I would ever sue a family member." But he also stated that "I knew my son didn't have any money. I mean[,] to what end would it lead for me to

sue my son?" He explained that Hudson would receive no benefit from suing Tom due to the latter's insolvency. Though perhaps partly motivated by a desire not to sue his son, Mr. Flanagan did not direct Hudson to pursue Tom as a co-guarantor at least in part because it was a poor business idea. Barger's "unfair advantage" argument boils down to an assertion that a creditor's declining to pursue a guarantor because he is related to the guarantor constitutes an "unfair advantage" over the remaining non-relative guarantor within the context of veil piercing. He cites no case law establishing this to be true.

Barger also argues that Hudson was formed to "relieve" Mr. Flanagan from the Guaranty so that he might "evade" his liability as a co-guarantor. Our Supreme Court has treated the question of whether a corporation was formed to evade personal liability as a question of fact whose resolution by the trial court should be affirmed if "evidence in the record supports that finding." *Dana*, 266 Va. at 500. An example of evidence supporting evasion is where two parties who are "aware that [a] roof continually leaked" and knew of "major structural defects" fail to replace or repair the roof and instead form a company that they use to "evade [their] personal liability" for selling the faulty roof. *Id.* Here, by contrast, Mr. Flanagan formed Hudson not to avoid a debt but to become a creditor by purchasing the Credit Agreement. He therefore paid for the right to be free from his obligation under the Guaranty. It was a purchase for value, permitted under the instruments' terms. Barger's argument that Mr. Flanagan directed Hudson to buy the debt to remove himself as guarantor is speculative and contradicted by other evidence showing that Hudson bought the Credit Agreement with a valid purpose in mind.

Furthermore, the record does not disclose such a "unity of interest and ownership" between Mr. Flanagan and Hudson that "the separate personalities of the corporation and the individual[] no longer exist[s]" because Hudson is co-owned by Mr. Flanagan's wife. *See Dana*, 266 Va. at 500. Unity of interest and ownership is a question of fact. *Id.* at 501. Evidence

shows that Mr. Flanagan's wife took an active part in Hudson's decisionmaking. Hudson's money came not from Mr. Flanagan alone but from property co-owned with his wife. Thus, he was obligated to answer for Restoration's debt whether the creditor was South Side Bank or Hudson.

In conclusion, we are "very reluctant to permit corporate veil piercing." *Id.* at 502. The record must leave no other permissible conclusion except that the shareholder formed the corporation "not to operate a corporate business" but "for an unjust purpose," or to "shield [himself] against" potential liability. *See id.* The record here shows that Mr. Flanagan's purpose in creating Hudson was to buy the Credit Agreement and to become a creditor. Hudson could not pursue Tom for the debt because he was bankrupt and did not pursue Mr. Flanagan because it released him from the Guaranty. That left only Barger to answer for Restoration's debt. Barger has not carried his difficult burden of showing that the record unambiguously demonstrates that Hudson was formed and used for an unjust purpose. Therefore, we affirm the implied finding that Hudson was not Mr. Flanagan's alter ego and hold against Barger on his remaining assignments of error.

D. Hudson's Assignments of Cross-Error

Hudson's first assignment of cross-error argues that the nonsuit order is not final. It is addressed and rejected above. *See* Part III.A. In its second assignment of cross-error, Hudson argues that Barger is barred from pursuing this appeal because he failed to timely post a bond under Code § 8.01-676.1. This assignment of cross-error does not challenge any decision by the circuit court. "An assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court . . . is not sufficient." Rule 5A:20(c)(2). Therefore, we decline to consider this assignment of error. Additionally, even if the assignment of cross-error is sufficient, Hudson points to no place in the record where it requested the circuit court to rule on

- 19 -

the issue. Rather, Hudson filed a motion requesting this Court to dismiss the appeal, which we denied. "Because [Hudson] did not obtain a ruling from the trial court on [this issue], 'there is no ruling for [this Court] to review' on appeal, and [its] argument is waived under Rule 5A:18." *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010) (third alteration in original) (quoting *Fisher v. Commonwealth*, 16 Va. App. 447, 454 (1993)).

In its third assignment of cross-error, Hudson argues that Barger withdrew his grounds for appeal—which he had argued in a motion to reconsider filed after the court's entry of judgment for Hudson but before the court's entry of the nonsuit order on November 9, 2023—by consenting to the court's February 27, 2024 "Final Order." This assignment of cross-error suffers the same fatal defects as the first. It does not challenge a ruling by the circuit court and is therefore insufficient. *See* Rule 5A:20(c)(2). We decline to consider it. Additionally, Hudson points to no place in the record where it made this argument to the circuit court or where the circuit court ruled on it. Thus, we conclude that even if the assignment of cross-error is sufficient, it is waived under Rule 5A:18. *See Williams*, 57 Va. App. at 347.

CONCLUSION

In sum, we deny Barger's motion to review and Hudson's first assignment of cross-error because the nonsuit order was final and ended the trial court's jurisdiction over the case. We reject Barger's first two assignments of error because Restoration's default made him answerable for the debt as the only viable guarantor. We also reject his third, fourth, fifth, and sixth assignments of error after finding his alter ego argument unavailing. And lastly, Hudson's second and third assignments of cross-error are insufficient and waived. We affirm.

*Affirmed*.