COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Friedman and Lorish
Argued at Salem, Virginia

**PUBLISHED**

SUE ANDERSON TEEL

                                                    OPINION BY
v.       Record No. 0053-25-3            JUDGE FRANK K. FRIEDMAN
                                                  NOVEMBER 18, 2025

WILLIAM LEE TEEL, EXECUTOR OF THE
 ESTATE OF GENE ATKINS TEEL, DECEASED

FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Robert M.D. Turk, Judge

Dennis P. Brumberg (John R. Langley; BWLaw PLC, on briefs), for
appellant.

Kyle McNew (H. Gregory Campbell; John S. Huntington;
MichieHamlett PLLC; Campbell & Ackerman; Huntington,
Huntington & Huntington, PLLC, on brief), for appellee.


Sue Anderson Teel appeals the circuit court's order finding that she had abandoned her

marital relationship to Gene Atkins Teel (whom we refer to by his nickname "Bull"), forfeiting

her interest in his estate under Code § 64.2-308.14(E).  We affirm.

BACKGROUND

Sue and Bull married in 1988 and had no children.  They never divorced.  In March 2022,

Bull died testate of what Sue described as "farmer's lung."  In his will, Bull declared that he

"ha[d] been separated [from Sue] for many years" and that "she willfully deserted the marriage

and abandoned [him] and the desertion and abandonment ha[d] continued throughout [his]

lifetime."  Accordingly, the will "ma[d]e no provision for" her and bequeathed Bull's entire

estate to his brother, William Lee Teel, who later qualified as the estate's executor.

In March 2023, Sue filed a complaint to determine her elective share of the augmented estate.[1] William opposed Sue receiving an elective share, claiming that she had abandoned the marriage. The trial court held a bench trial in September 2024.

*The Evidence at Trial*

Sue testified that she and Bull had separated by mutual agreement in July 2016 because they "fought the entire time that [they] were living together." They owned two houses together; after the separation, Sue began living in the house at Claytor Lake while Bull lived in the house "at the farm."[2]

After their separation, Sue and Bull continued to split bills for things like utilities and cell phones and owned a few cars together. They also adopted two Schnauzers together in November 2016. Sue cared for the dogs on the weekends while Bull cared for them during the week.

In Sue's words, she and Bull "texted a lot" because they "were still friends." Sue "did not see a need to be divorced" but left that decision to Bull, whom she testified did not want a divorce. Nonetheless, Sue testified that they never discussed getting back together because they "seemed to get along better" when they lived apart and "went back to being friends."

In December 2016, about five months after separating from Bull, Sue began a romantic relationship with Kevin Brown, which became sexual in 2017 and was ongoing at the time of trial. She and Bull had never discussed having an "open marriage where [they] would be free to date other people outside the marriage." When Sue told Bull about her new relationship, Bull responded simply, "I hope he treats you well." Sue also claimed that Bull was cordial the few

---

[1] Although Sue had previously furnished William with a claim for the family, exempt property, and homestead allowances, her complaint sought only her elective share. Code §§ 64.2-309 to -311.

[2] Sue and Bull still had joint ownership of the two houses when Bull died, and both properties passed to Sue. She was also a 25% beneficiary on one of Bull's life insurance policies.

times he met Brown. Sue's relationship with Brown was public, and she posted pictures of her and Brown on social media. Sue testified that her sex life with Bull had been "[n]onexistent" for "[p]robably 15 to 20 years" before they separated.

Sue further testified that Bull was on her health insurance and that she had offered to take him to medical appointments and find him in-network caregivers when his illness began but that those services were ultimately unnecessary. She claimed that she visited him "almost every day" when he was in the hospital and helped clean his house while he was sick. But she acknowledged that "[h]is family took over most of his caregiving when he got sick."

William called nine witnesses during his case in chief who painted a different portrait of Sue and Bull's relationship. Bull's friends Marsha and Clarence Smith, Jr. regularly "hung out" with Bull and Sue before the separation. They then had dinner with just Bull "[s]everal times a week" during Sue and Bull's separation and often visited Bull in the hospital during his illness. They saw Sue leaving the hospital once but otherwise did not see her there. In fact, Marsha testified that she never saw Sue and Bull together after 2016, and Clarence testified that he saw them together only rarely when the two exchanged custody of the dogs. According to Marsha, Bull was "always very, very sad" when he talked about Sue's relationship with Brown.

Bull's friend Kevin Harris had contact with Bull "monthly in some form or another" during the separation and sometimes took Bull to medical appointments; he noted that Sue "was never present when [Harris] was with" Bull. Robert Miller saw Bull on average "once a week" during the separation. He saw Sue with Bull once, "perhaps, exchanging dogs" but usually did not see them together. Clara Sowers learned about the separation when a restaurant owner asked Bull "where Sue was" and Bull responded that "she wasn't there at the house anymore." Sowers continued to see Bull "[a]bout three times a week" after the separation and Sue was never

present.  She visited Bull in the hospital three times and did not see Sue there.  Sowers "could tell [Bull] was hurt" about Sue's relationship with Brown.

Ashley Oliver, Mitzi Young, Melinda Smith, and Traci Burke were Bull's in-home caregivers from October 2021 until he was hospitalized in January 2022.  They worked 12-hour shifts, and one of them was with Bull every day of the week.  Neither Oliver nor Young ever saw Sue, and Oliver testified that Sue was not involved in Bull's care.  Burke saw Sue once when Sue exchanged the dogs with Bull.  Sue was not one of Bull's emergency contacts.  Young testified that Bull would sometimes receive a text from Sue and "would become emotional and cry."  Smith met Sue three times.  Brown was present on one of those occasions; according to Smith, Bull was polite to Brown but cried after Sue and Brown left.

*The Trial Court's Ruling*

The trial court issued a letter opinion finding that Sue had "willfully abandoned the marital relationship . . . and is therefore barred from an elective share of [Bull's] estate."  The court acknowledged that the separation had been "more or less agreed to by both spouses" and that both spouses "retained some joint responsibilities such as paying bills and caring for a group of dogs."  The court ultimately found, however, that Sue and Bull otherwise "had little, if any, relationship to speak of."  The court, relying upon testimony that Sue and Bull were rarely seen together after the separation, as well as evidence of Sue's ongoing relationship with Brown, found "that [n]either party cared for the other in the typical marital sense and neither party fulfilled matrimonial duties."  The court relied on *Purce v. Patterson*, 275 Va. 190, 194 (2008), for the proposition that the parties' mutual separation did not foreclose a finding of abandonment.  The court entered the final order against Sue in December 2024.  This appeal followed.

ANALYSIS

"The surviving spouse of a decedent who dies domiciled in [Virginia] has a right . . . to take an elective-share amount equal to 50 percent of the value of the marital-property portion of the augmented estate." Code § 64.2-308.3(A). But "[i]f a spouse willfully deserts or abandons the other spouse . . . until the death of the other spouse," the abandoning spouse is "barred of all interest in the decedent's estate." Code § 64.2-308.14(E).

Whether a surviving spouse abandoned the deceased spouse "is a mixed question of law and fact." *Purce*, 275 Va. at 194. "When a trial court renders judgment after a bench trial, we cannot set aside that judgment as contrary to the evidence 'unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.'" *Moncrieffe v. Deno*, 76 Va. App. 488, 496 (2023) (quoting Code § 8.01-680). "When judges sit as factfinders, 'no less than jurors,' we give their determinations 'the highest degree of appellate deference.'" *Id.* (quoting *Palmer v. R.A. Yancey Lumber Corp.*, 294 Va. 140, 158 (2017)). This Court "view[s] the evidence and all reasonable inferences drawn from it in the light most favorable to . . . the prevailing party at trial." *Id.* (second alteration in original) (quoting *Palmer*, 294 Va. at 159). "[B]ut we review the trial court's application of the law to th[e] facts de novo." *Purce*, 275 Va. at 194 (quoting *Collins v. First Union Nat'l Bank*, 272 Va. 744, 749 (2006)).

The Supreme Court first defined "abandonment" in an elective share context in *Purce v. Patterson*. *Id.* at 194-96 (construing Code § 64.2-308.14's substantively-identical predecessor statute, Code § 64.1-16.3). Looking to domestic relations cases, the Court explained that "'abandonment' is generally used synonymously with 'desertion,'" which the Court noted had been defined as "a breach of matrimonial duty—an actual breaking off of the matrimonial cohabitation coupled with an intent to desert in the mind of the deserting party." *Id.* at 195 (quoting *Petachenko v. Petachenko*, 232 Va. 296, 298-99 (1986)). Ultimately though, the Court

defined abandonment as the "termination of the normal indicia of a marital relationship combined with an intent to abandon the marital relationship." *Id.*

Of course, not every marriage will look alike, and not every couple will define their marriage in the same way. Thus, assessing whether the surviving spouse has terminated "the normal indicia" of a marital relationship requires an assessment of what the relationship looked like before the purported abandonment. After all, "there exists no single, monolithic matrimonial duty, [and] the practical obligations that accompany marital life are manifold." *Payne v. Payne*, 77 Va. App. 570, 585 (2023).[3] Only by determining how the spouses defined their particular marriage can a court determine whether the surviving spouse intended to abandon the marriage.

*Purce* also explained that "there are significant differences in the analysis of the evidence when resolving the issue in the domestic relations and elective share contexts." *Purce*, 275 Va. at 195. For example, in the domestic relations setting, "a finding of abandonment . . . is based on fault," *id.* at 196, but in the elective share context it is not, *id.* at 195-96. Also, pertinent here,

---

[3] In *Purce*, the Court noted that, historically, "[d]omestic relations cases have considered 'matrimonial duty' to include cooking, cleaning, support, and contributing to the well-being of the family." *Purce*, 275 Va. at 195. The primary case cited for that proposition was *Goodwyn v. Goodwyn*, 222 Va. 53 (1981), in which the Court held that the wife's "cessation of sexual intercourse for a period of less than two months" did not constitute abandonment because she "clean[ed] the house, cook[ed] the meals, and car[ed] for the children." *Id.* at 55. In doing so, the Court applied the standard that "a spouse's unjustified withdrawal of sexual intercourse constitute[s] desertion 'when such withdrawal is accompanied . . . with such willful breach and neglect of other marital duties as to practically destroy home life in every true sense, and to render the marriage state well nigh intolerable and impossible to be endured." *Id.* (second alteration in original) (quoting *Chandler v. Chandler*, 132 Va. 418, 430-31 (1922)). Although the *Purce* Court did not expressly repudiate those older cases, the Court chose to use the phrase "normal indicia of a marital relationship" instead of "matrimonial duty" in its definition of abandonment. *Purce*, 275 Va. at 195. And other than *Purce*, the Supreme Court has not used the phrase "matrimonial duty"—in any context—since 1986. *Petachenko*, 232 Va. at 299. This possibly reflects the fact that in an ever-changing society (and in a lengthy relationship) traditional, stereotyped roles may shift over time; similarly, there are many reasons certain "duties" might not be fulfilled—disability, incarceration, incapacity, old age—that have nothing to do with the desire to abandon a marriage. In any event, for purposes of our analysis here, we will focus on reviewing evidence relating to the termination of the normal indicia of Bull and Sue's marital relationship.

- 6 -

"[i]n an elective share analysis, an agreed separation . . . is relevant evidence of the termination of cohabitation, but is not evidence which defeats a finding of *willful* abandonment." *Id.* at 195. Put another way, a court can still find that one spouse abandoned the marriage under Code § 64.2-308.14(E) even if the separation was mutual. "The relevant evidence is" whether the surviving spouse's "conduct showed a lack of support for [the other spouse] and the marital relationship." *Id.* at 196.

With those principles in mind, we conclude that the trial court's factual finding that Sue abandoned the marital relationship was not plainly wrong or without evidence to support it.[4] Despite Sue's primary argument that there was no direct evidence of her intent to abandon the marriage, it is well established that intent must generally be proved by circumstantial evidence. *H.C. v. Potomac Hosp. Corp. of Prince William*, 81 Va. App. 1, 26 n.13 (2024). The "concept of intent has an abstract quality, making a court's determination of intent heavily reliant on the factual context in which it is examined." *Lisann v. Lisann*, ___ Va. ___, ___ (May 8, 2025).

Here, there was ample evidence that Sue intended to abandon the normal indicia of the couple's marriage—and that she retained that intent through Bull's death. The couple stopped living together and began living in separate houses. There was evidence that they saw each other infrequently and generally only to accomplish some particular task, such as exchanging the dogs. Marsha Smith, for example, testified that regular outings with Bull and Sue became outings with just Bull following the separation. And the testimony indicated that Sue had, at best, a very

---

[4] In addition to challenging the trial court's factual findings, Sue argues that the court made a legal error in its reading of *Purce*. In *Purce*, the Court stated that "[t]he relevant evidence is Marrill's conduct and his intent." *Purce*, 275 Va. at 196. In its letter opinion, the trial court quoted *Purce*, 275 Va. at 196, as stating, "[t]he relevant evidence is [the surviving spouse's] conduct and [their] intent." Sue contends that the trial court's use of "their" instead of "his" demonstrates that the court erroneously considered both spouses' intent. In context, we believe that the court altered the pronoun to make it gender neutral—consistent with the court's altering "Marrill" to "the surviving spouse"—and not to make it plural.

minor role in caring for Bull during his terminal illness that was no greater than many of his friends and family members.

Most importantly, Sue began a separate romantic and sexual relationship mere months after separating from Bull and maintained that relationship for years through Bull's death. Several witnesses testified that Sue's relationship with Brown caused Bull great pain. Bull's feeling of abandonment, as expressed in his will, corroborates that testimony. And Sue admitted that she and Bull had never discussed or agreed that they would be free to date other people outside the marriage. Further, she touted her relationship with Brown on social media for the world to see. The factfinder could easily conclude that Sue's decision to move out of the marital home, begin a long-term romantic relationship with Brown, sharply reduce her contact with Bull, and promote her connection with Brown to the world—when viewed together—demonstrated an intent to terminate the "normal indicia" of her marriage to Bull.[5]

Sue's testimony does not compel a different result. For one thing, the trial court was not required to credit Sue's testimony. *See Purce*, 275 Va. at 196. But even if the court had credited Sue's testimony, Sue made clear that she did not intend to get back together with Bull and had left him the ultimate decision of whether to pursue a divorce. The factfinder could view the couple's continued comingling of finances and Sue's testimony that she "didn't see a need to be divorced" as simply a matter of convenience. The fact that Sue and Bull never got legally divorced, referenced heavily throughout Sue's brief, cannot be dispositive of whether she had abandoned the marriage under Code § 64.2-308.14(E). After all, that code section can *only*

_____

[5] In her reply brief, Sue argues that Bull failed to carry out his matrimonial duty and that he "withdrew from the marriage, not Sue." Even if this were accurate, nothing in *Purce* suggests that is a relevant consideration in this context. Again, in a domestic relations setting, "a finding of abandonment . . . is based on fault." *Purce*, 275 Va. at 196. But that is not true in an elective share context, which is why a mutual separation does not foreclose a finding of abandonment. *Id.* at 195-96. Here, the focus is on whether the surviving spouse terminated the normal indicia of a marital relationship.

apply where there has been no divorce. Moreover, to the extent the parties' financial comingling and health insurance arrangements constituted "financial support," *Purce* does not indicate that any lingering support, no matter how minimal or vestigial, precludes a finding of abandonment if all other indicia of the marital relationship have collapsed. *See Purce*, 275 Va. at 196 (noting that the abandoning spouse "provided [the deceased spouse] with *little* or no support or care during her illnesses and recoveries" (emphasis added)).[6]

Here, there is abundant evidence that Sue's conduct demonstrated a "termination of the normal indicia of a marital relationship combined with an intent to abandon the marital relationship." *Id.* at 195. Similarly, the record fully supports the trial court's conclusion that, after the 2016 separation, Sue stopped caring for Bull "in the typical marital sense." As Sue herself testified, she and Bull "went *back* to being friends" after the separation, suggesting a reversion to a pre-marital state. (Emphasis added). Once Sue left the marital home, she and Bull never talked of getting back together. Within months she was in a romantic relationship with another man—and Sue observed that she and Bull "seemed to get along" better as friends. In short, while the evidence indicates that Bull and Sue did continue to maintain a cordial relationship post-separation, the record fully supports the trial court's finding that Sue abandoned the marital relationship. In doing so, she relinquished her right to an elective share of Bull's augmented estate.

CONCLUSION

For these reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[6] In *Purce*, husband offered scant care to wife during the cohabitation period of the marriage and even less support after their mutual agreement to live apart. It was, therefore, not difficult for the court to conclude that husband's "conduct showed a lack of support for [wife] and the marital relationship," despite his protests that he "did not want the marriage to end." *Purce*, 275 Va. at 196.